**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

GARY WAYNE RODRIGUES,
        *Defendant-Appellant.*

No. 11-15530

D.C. No.
1:10-cv-00406-
DAE-KSC

OPINION

Appeal from the United States District Court
for the District of Hawaii
David A. Ezra, District Judge, Presiding

Argued and Submitted
February 15, 2012—Honolulu, Hawaii

Filed March 27, 2012

Before: Alfred T. Goodwin, Stephen S. Trott, and
Mary H. Murguia, Circuit Judges.

Opinion by Judge Trott

**COUNSEL**

Eric A. Seitz, Honolulu, Hawaii, for the defendant-appellant.

Lawrence L. Tong, Assistant United States Attorney, Honolulu, Hawaii, for the plaintiff-appellee.

**OPINION**

TROTT, Circuit Judge:

> "Oh what a tangled web we weave
> when first we practice to deceive!"

Sir Walter Scott, *Marmion*, Canto VI, Stanza 17.

In his capacity as the State Director of the United Public Workers, AFSCME, Local 646, AFL-CIO ("UPW") Petitioner Gary Wayne Rodrigues negotiated contracts with dental and health insurance providers, ostensibly on behalf of UPW members and their families. The providers were Hawaii Dental Services ("HDS") and Pacific Group Medical Association ("PGMA"). At Rodrigues's request, the providers included in these contracts what purported to be "consultant's fees." These fees were effectively to be paid by UPW members as part of their insurance premiums to the insurance providers, but the fees eventually ended up in the pockets of persons Rodrigues designated as the "consultants." As it turned out, the purported consultants were (1) the stepfather of Rodrigues's girlfriend and secretary, Al Loughrin, and (2) shell companies of which Rodrigues's daughter, Robin Haunani Rodrigues Sabatini ("Sabatini"), was the sole shareholder, only Director, and simultaneously the President, Vice President, Secretary, and Treasurer. During the investigation of these relationships and transactions, it was discovered that neither designated consultant did any real consulting work on these contracts, and that part of the "consultant's fees" were diverted to Rodrigues's personal use — circumstances unknown to the UPW.

A jury convicted Rodrigues of fifty counts of "theft of honest services" from the UPW and its members. The jury also convicted him of conspiracy, embezzlement, money laundering, and health care fraud.

After we affirmed his conviction on appeal, *United States v. Rodrigues*, 237 Fed. Appx. 178 (9th Cir. June 11, 2007) (unpublished), the Supreme Court decided in *Skilling v. United States*, ___ U.S. ___, 130 S. Ct. 2896 (2010), that the crime of theft of the intangible right of honest services, as described in 18 U.S.C. § 1346 and alleged in Counts 1-50, is limited to conduct that encompasses "bribes and kickbacks," *id.* at 2932, because any broader construction would be unconstitutionally vague, *id.* at 2929. The jury in Rodrigues's case had not been so instructed, leaving us here with an instructional omission of constitutional proportions regarding an element of the crime of which he was convicted. We must now decide, as commissioned by the Court in *Skilling*, whether that trial error was harmless, or not.

Following a searching examination of the record, we conclude beyond a reasonable doubt that this error had no "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal quotation marks omitted); *see also Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008) (per curiam) (whether a defendant suffered prejudice from an instructional error is governed by the *Brecht* standard); *Neder v. United States*, 527 U.S. 1, 15 (1999) (harmlessness with respect to the omission of an element of the offense from the instructions must be demonstrated beyond a reasonable doubt). Accordingly, we affirm the theft of honest services, money laundering, and health care fraud judgments of conviction against Rodrigues and the denial of his petition by the district court.

## BACKGROUND

The serial consultants Rodrigues designated in this scheme were Al Loughrin ("Loughrin"), and later, effectively Rodrigues's daughter Robin Haunani Rodrigues Sabatini ("Sabatini"), whose companies at different times received the disputed consultant's fees from UPW. Loughrin was the "UPW Consultant" from October 2, 1992 until March 16,

1994. Loughrin, to whom Petitioner owed $10,000, was also the stepfather of Petitioner's one-time girlfriend and secretary, Georgietta Carol. Between 1992 and 1994, HDS paid Loughrin $14,430.21 in "consultant's fees." This money went to extinguish a personal debt Rodrigues owed to Loughrin, a debt that had no connection to UPW business. Loughrin's widow and Carol both testified that Loughrin did not perform any consulting work for UPW in exchange for the fees.

On March 16, 1994, after the personal debt to Loughrin had been satisfied, Petitioner informed HDS that Loughrin was no longer a UPW consultant. Rodrigues then directed that all consultant's fees should be held until a new consultant was designated. Thereafter, Petitioner designated his daughter's company, Four Winds RSK, Inc. ("Four Winds") of Kapaa, Kauai as the "consultant." Four Winds was not incorporated until February 13, 1996. At that point, HDS "cleared its books" with respect to the accrued consultant's fees by writing a check in the amount of $25,381.19 to Four Winds on March 25, 1996, covering premiums paid by UPW for the period from January 1994 through December 1995—*before* Four Winds was incorporated. Beginning on March 26, 1996 and through 1997, HDS continued to make quarterly payments to Four Winds. At trial, various UPW witnesses testified that they had no contact with Four Winds other than to send it checks, and that they had never seen any work produced by Sabatini.

In late 1997, adverse attention was drawn by the media to Four Winds, so Sabatini transferred Four Winds' assets to a new company called Auli'i, Inc., which was incorporated using only her middle and maiden names. At Rodrigues's direction, HDS then began indirectly to make payments to Auli'i, Inc. in 1998 by paying the consultant's fees to Voluntary Employees Benefit Association of Hawaii ("VEBAH"). VEBAH then paid the fees to Management Applied Programming ("MAP"), which in turn paid Auli'i, Inc. Sabatini at this time tried to make it seem as though she had performed con-

sulting work, but in actuality all the documentation and work she submitted to MAP had been done by UPW employees.

## JURY INSTRUCTION

The jury was instructed with respect to mail fraud as charged in Counts 1-50 as follows:

> First, the defendant knowingly devised a scheme or artifice to deprive UPW and its members of their right to Defendant Gary Rodrigues' honest services as the state director of UPW; Second, the defendant acted with the intent to deprive UPW and its members of their right to the honest services of Gary Rodrigues; Third, the defendant knew or reasonably should have foreseen that the scheme could cause some economic or pecuniary harm to the UPW and its members. Pecuniary harm may include, but is not limited to, loss of services that were due; and Fourth, in advancing, or furthering, or carrying out, or attempting to carry out an essential part of the scheme, the defendant caused the use of the United States mails.

Pursuant to *Skilling*, the appropriate instruction for this charge is now found in our 2010 Ninth Circuit Model Criminal Jury Instructions for "Mail Fraud — Scheme to Defraud — Deprivation of Right to Honest Services." This new *Skilling* instruction requires a jury to find that:

> First, the defendant devised or knowingly participated in a scheme or plan to deprive [victim] of [his] [her] right of honest services; Second, the scheme or plan consists of a [bribe] [kickback] in exchange for the defendant's services. The "exchange" may be express or may be implied from all the surrounding circumstances; Third, the defendant acted with the intent to defraud by depriving [victim] of [his] [her]

right of honest services; Fourth, the defendant's act was material; that is, it had a natural tendency to influence, or was capable of influencing, [a person's] [an entity's] acts; and Fifth, the defendant used, or caused someone to use the mails to carry out or to attempt to carry out the scheme or plan.

Ninth Circuit Model Criminal Jury Instructions 8.123 (2010).

Using this new instruction as a guide, our task thus is to ascertain whether it is "clear beyond a reasonable doubt that a rational jury would have found [Rodrigues] guilty [of theft of honest services] absent the error." *Neder*, 527 U.S. at 18. Accordingly, we ask "in typical appellate-court fashion, . . . whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *Id.* at 19. Our review of the district court's harmless error determination is de novo, its finding of facts is for clear error. *Padilla v. Terhune*, 309 F.3d 614, 617, 621 (9th Cir. 2002).

## KICKBACKS

The Supreme Court in *Skilling* gave us a classic example of a kickback, the elements and DNA of which we have in mind as we begin our analysis. The factual example chosen by the Court comes from *McNally v. United States*, 483 U.S. 350 (1987), which the *Skilling* Court portrayed as follows:

A public official, in exchange for routing Kentucky's insurance business through a middleman company, arranged for that company to share its commissions with entities in which the official held an interest. This was no mere failure to disclose a conflict of interest; rather, the official conspired with a third party so that both would profit from wealth generated by public contracts.

*Skilling*, 130 S. Ct. at 2932 (citations omitted).

The Court also defined a kickback as "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to [enumerated persons] for the purpose of improperly obtaining or rewarding favorable treatment in connection with [enumerated circumstances]." *Id.* at 2933-34 (brackets in original) (quoting 41 U.S.C. § 52(2)).

## THE INDICTMENT

**[1]** First, we turn to the Indictment to ascertain whether Rodrigues was on notice he was facing charges that included allegations of conduct that qualified as kickbacks. He was. The Second Superseding Indictment charges Rodrigues in Counts 1-50 with an honest services "scheme to defraud" UPW and its members. The "manner and means of the scheme to defraud" alleges that Rodrigues caused "money [to be] paid out of UPW accounts to HDS ostensibly as premiums for dental benefits which was in excess of the premiums required by HDS to provide the dental benefits to UPW members." The Indictment then alleges as "acts by the defendants in furtherance of the scheme" as follows:

> 1. It was a part of the scheme and artifice to defraud that on or about June 9, 1992, and thereafter renewed annually, defendant GARY WAYNE RODRIGUES, on behalf of UPW, negotiated a contract with HDS to provide dental benefits for members of UPW. Defendant GARY WAYNE RODRIGUES also negotiated an "Addendum" to the contract for a consulting fee to be paid to UPW's designated consultant. The cost of the consulting fee was added to the premium that HDS charged UPW for the dental coverage for its members.

> 2. It was further a part of the scheme and artifice to defraud that defendant GARY WAYNE RODRI-

GUES informed the Executive Board that HDS would be providing dental benefits to UPW members for a specified premium amount but did not disclose the fact that the premiums charged by HDS were inflated to include the consulting fee negotiated by defendant GARY WAYNE RODRIGUES.

3. It was further a part of the scheme and artifice to defraud that from approximately October 2, 1992 to approximately March 16, 1994, defendant GARY WAYNE RODRIGUES directed HDS to pay the consulting fees to an individual, now deceased, [Al Loughrin] to pay off a personal loan from that individual to defendant GARY WAYNE RODRIGUES.

4. It was further a part of the scheme and artifice to defraud that defendant GARY WAYNE RODRIGUES did not disclose or account to the Executive Board of UPW or to the membership of UPW that he had directed the payment of consulting fees payable under the UPW-HDS contract to an individual as payment for a personal debt of defendant GARY WAYNE RODRIGUES.

5. It was further a part of the scheme and artifice to defraud that defendant GARY WAYNE RODRIGUES, in a letter dated March 16, 1994 to HDS, requested that all consultant fees be held by HDS until further notification.

6. It was further a part of the scheme and artifice to defraud that sometime prior to March 25, 1996, defendant GARY WAYNE RODRIGUES, instructed HDS to pay the consultant fees held by HDS under the UPW contract, to Four Winds RSK, Inc., which was incorporated by defendant GARY WAYNE RODRIGUES'S daughter, defendant

ROBIN HAUNANI RODRIGUES SABATINI on February 13, 1996.

7. It was further a part of the scheme and artifice to defraud that defendant GARY WAYNE RODRIGUES did not disclose to the Executive Board of UPW or to the membership of UPW that he had directed the payment of consulting fees payable under the UPW-HDS contract to his daughter's company.

8. It was further a part of the scheme and artifice to defraud that defendants GARY WAYNE RODRIGUES and ROBIN HAUNANI RODRIGUES SABATINI caused HDS to mail on approximately March 28, 1996, a check payable to Four Winds RSK for consultant fees in one lump sum of $25,381.19 for the period January 1994 to December 1995, when, in fact, Four Winds RSK, Inc., was not in existence until February, 1996 and could not have and did not perform any consulting work for UPW.

9. It was further a part of the scheme and artifice to defraud that defendants GARY WAYNE RODRIGUES and ROBIN HAUNANI RODRIGUES SUBATINI caused HDS to mail three additional checks in 1996 to Four Winds RSK, Inc., for consultant fees totalling [sic] $20,945.26 when, in fact, Four Winds RSK, Inc., performed no consulting work for UPW.

10. It was further a part of the scheme and artifice to defraud that defendants GARY WAYNE RODRIGUES and ROBIN HAUNANI RODRIGUES SABATINI caused HDS to mail a total of 4 checks in 1997 to Four Winds RSK, Inc., for consulting fees totalling [sic] $45,358.40, when in fact, Four Winds RSK, Inc. performed no consulting work for UPW.

11. It was further a part of the scheme to defraud that GARY WAYNE RODRIGUES failed to disclose to the Executive Board of UPW and to the UPW members that Four Winds RSK, Inc., or ROBIN HAUNANI RODRIGUES SABATINI, his daughter, received consulting fees, based on the dental benefits contract between HDS and UPW and that no work was performed by Four Winds RSK, Inc., or ROBIN HAUNANI RODRIGUES SABATINI for the consulting fees.

**[2]** The Indictment also included (1) similar specific factual allegations regarding Rodrigues's use of VEBAH and MAP as intermediaries to funnel these fees from HDS to Auli'i, Inc., his daughter's shell company; and (2) allegations against Rodrigues concerning the same scheme involving consultant's fees directed from PGMA to his daughter's corporation.

**[3]** In summary, there can be no doubt whatsoever that the Indictment charges Rodrigues with a textbook example of kickbacks.

## THE EVIDENCE

**[4]** Close scrutiny of the Government's case offered to prove the kickback allegations in the Indictment assures us that the Government's convincing evidence overwhelmingly proved its charges. Rodrigues — not HDS — proposed the idea of consultant's fees before he closed the deal with HDS. Then, he steered those fees, which were not earned, to his daughter's and to his own use. Not only did he use this process to discharge a personal $10,000 loan to a sham consultant, Al Loughrin, but he used part of the money he channeled to his daughter to purchase a Ford Ranger pickup truck for $14,213.64. He purchased this truck from Honolulu Ford on December 3, 1996, with a cashier's check in that amount issued by First Hawaiian Bank. His daughter Sabatini pur-

chased that check from the bank payable to Honolulu Ford on December 2, 1996. A Special Agent for the Internal Revenue Service testified that he tracked to Four Winds the money Sabatini used to purchase the check. Rodrigues then personally used this cashier's check to close the deal. He titled the truck in his own name. The agent also traced money paid by HDS as consultant's fees through Four Winds and Auli'i, Inc. to another daughter, Shelly Rodrigues, and from Four Winds to Rodrigues's mother, Gertrude. In turn, bank records showed subsequent money transfers from Gertrude back to Rodrigues.

[5] The quality of the Government's evidence was virtually unassailable. Every material point to which a Government witness testified was corroborated by undisputed documentary evidence, such as the First Hawaiian Bank cashier's check, business records from Honolulu Ford, a letter dated October 2, 1992, from UPW signed by Rodrigues designating Loughrin as its consultant, and a subsequent check from HDS to Loughrin to pay for a sprinkler system installed on Rodrigues's property in Oregon.

## THE DEFENSE

Against this wall of evidence, Rodrigues raises three claims, asserting that the Government proved nothing more than an undisclosed conflict of interest.

[6] First, Rodrigues asserts "there was no showing that the [consultant's] fees were payments in exchange for UPW renewing its contracts with HDS and PGMA." This allegation grossly mischaracterizes the deal Rodrigues brokered. Prior to its contractual arrangement with HDS, UPW already had a dental plan with another company, the Hawaiian Medical Services Association. At a meeting between Rodrigues and HDS President Dr. Wallace Loo, held after HDS solicited the same business for itself, Rodrigues raised the issue of consultant fees, not Dr. Loo. When Loo then offered such an arrange-

ment, Rodrigues accepted on behalf of UPW in a letter dated January 30, 1992:

> Dear Dr. Loo:
>
> We have reviewed your proposal for the group dental plan for our members. We agree to:
>
>> . . .
>>
>> 2. The one percent (1%) Administrative fee and the one percent (1%) Consultant fee.

An addendum to the contract memorialized the agreement as follows:

> HDS agrees to pay to UPW AFSCME Local 646, AFL-CIO Hawaii, 1% of Employer's Payments as consultant's fee. Upon notification, HDS agrees to pay 1% to UPW's designated consultant.

Clearly, HDS's acceptance of Rodrigues's consultant's fees proposal sealed the deal, and the die was cast. When additional contracts were signed between UPW and HDS, the consultant's fees increased to 2.2%.

[7] Next, Rodrigues argues that the "consultant's fees" paid to Al Loughrin and to his daughter's shell companies cannot qualify as kickbacks because the fees were not paid directly to him. This argument is spurious. To begin with, Rodrigues and his daughter/co-defendant Sabatini were co-conspirators in this crime, as established by her conspiracy conviction with respect to this fee arrangement. As the Government correctly asserts, to honor Rodrigues's argument would allow a person committing honest services fraud to avoid legal responsibility simply by directing illegal payments to a co-conspirator. Such a rule foolishly would create a loop-

hole through which all kickbacks could then slither unchecked, thereby eviscerating § 1346. Moreover, Rodrigues did personally receive direct benefits from this scheme — albeit laundered — as demonstrated first by his use of the fees to satisfy his outstanding $10,000 debt to Loughrin, and then by his use of HDS consultant's fees to purchase a truck. In the words of *Skilling*, Rodrigues did illegally "profit from wealth generated by public contracts." *Skilling*, 130 S. Ct. at 2932.

**[8]** Finally, Rodrigues protests that this fee arrangement cannot be a kickback because it was not a result of "coercion or a secret agreement." It is certainly true that the contractual consultant's fees arrangement between UPW and HDS was out in the open, but the arrangement kept secret the salient facts that (1) the consultants did no consulting work, (2) Rodrigues was funneling money to his daughter's and to his own use, and (3) this deal increased premiums paid by UPW members and their families without any corresponding benefit. As we said on direct appeal, Rodrigues "us[ed] his ability to enter contracts on the unions [sic] behalf in order to secretly obtain money for himself or the person of his choosing in connection with those contracts." *Rodrigues*, 237 Fed. Appx. at 184. There can be no doubt from this record that Rodrigues's concealment of the true nature of his chicanery was actionable fraud by material omission committed against UPW and its members. What the union saw was not what it got: higher unearned premiums for its members that went into the waiting pockets of Rodrigues, his daughter, his mother, and Al Loughrin.

Furthermore, when UPW was served with a subpoena for documents reflecting payments to Four Winds, Rodrigues personally shredded some of them. His actions impeach his claim that there was nothing secret or clandestine about what he had done. The following is an excerpt from the testimony of a UPW employee on this subject:

> On August 26, 1999, at about 11 o'clock, I was in Gary Rodrigues' office by entering his doorway and

I had a question for him. So he said: Sure, what — you know, what — you know, what can I do for you? And I said: Well, remember the file, the information I gave to you in January of this year? And he says — you know, referencing the HDS form 5500s and the correspondence? And he says: Yeah, what about it? And I said: Don't you think that we should be submitting those documents as part of the subpoena? And he says — he looks at me and he said: It's shredded. It's destroyed. It's gone.

And I kind of looked at him and he says: Well, soon after you told me that we were not — we were not required to file a Form 5500 for the HDS dental plan, I got rid of it. I shredded it. And so I looked at him and I said: Oh, okay. And I left his office.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

[9] The district court's factual summary of this contractual arrangement accurately captures its essence:

Here, Petitioner used his position within UPW to solicit and negotiate contracts with HDS and PGMA. HDS and PGMA received the benefit of those contracts provided they agreed to submit consulting fees to a consultant designated by Petitioner. As a result of these contracts, benefit was conferred upon the insurance companies in the form of business received, and payments were made to Petitioner's designated recipients for his personal benefit.

This iteration of the facts is fully supported by substantial evidence in the record.

Although we review de novo the instructional issue, we do not ignore the district court's analysis. Judge Ezra, an experienced jurist, said the following in his Order Denying Petition-

er's § 2255 Motion dated January 31, 2011, observations with which we agree:

> In the instant case, the Government's evidence against Petitioner was overwhelming. The Government presented letters, insurance contracts, and other hard evidence showing that Petitioner established "consulting fees" with the insurance companies, as well as evidence showing Loughrin and Sabatini as the "consultants" or beneficiaries of the consulting fees. Based on the wealth of evidence against Petitioner, the jury found Petitioner guilty of 102 out of 102 Counts. The facts relied upon by the jury in finding Petitioner guilty of all 102 counts including the counts for honest services fraud, money laundering, and embezzlement, are identical to the facts outlined above which illustrate that Petitioner received kickbacks. Because the facts necessary to establish that Petitioner received kickbacks were presented at trial and affirmed via guilty verdict by the jury, the omission of the kickback element at trial did not have a "substantial and injurious effect or influence in determining the jury's verdict."

> Furthermore, the Court determines that in light of the jury's verdict, as affirmed by the Ninth Circuit, it is clear that the jury had to have found that Petitioner engaged in a kickback scheme. The undisputed facts in evidence, relied upon in the Court's analysis of the kickback scheme, are not newly discovered or established. Thus, under the same set of facts, the jury would have found Petitioner guilty of receiving kickbacks in an honest services fraud scheme. Accordingly, the now-necessary element of a kickback, had it been included in the jury instructions at trial, would have resulted in the same verdict. Additionally, the Court concludes that the omission of the kickback element did not in any way

impair the fundamental fairness of the proceeding. Therefore, the Court determines that Petitioner received kickbacks as a result of his mail fraud and health care fraud schemes, and that the failure to include a kickbacks element in the jury instructions was harmless error.

(citations omitted).

We note also that the jury convicted Rodrigues of embezzling $208,280 from UPW. This sum represented the consultant's fees percentage of the monies paid to HDS between April 1996 and December 2000. On direct appeal, we affirmed his convictions of five counts of embezzlement of union funds, and those counts are not before us as part of this appeal. We reiterate what we said on direct appeal about the essence of Rodrigues's strategy to steal money from his own union and its members:

The indictment said that Rodrigues committed embezzlement by causing the union to pay Hawaii Dental Service. And the specific amounts of money in the indictment represented the consultant fee percentage of the monies paid to HDS. It was clear to everyone (the grand jury, the parties, the judge, etc.) what the embezzlement charge was about. The pretrial correspondence functioned as a bill of particulars, informing the defense that "the specific amounts of money . . . were calculated based on the premiums HDS received from [the union] multiplied by the negotiated consultant fee amount." That is how the case was presented to the jury.

*Rodrigues*, 237 Fed. Appx. at 181 (alteration in original).

## MONEY LAUNDERING

[10] Rodrigues's appeal of his money laundering and health care fraud convictions depends entirely on his claim

that the money involved was not derived from a crime. Because we conclude that it did, we also affirm these convictions.

AFFIRMED.