**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| DEARCEY JAMUL STEWART, *Petitioner-Appellant*, | No. 10-55985 |
| v. | D.C. No. 3:05-cv-01059-BTM-CAB |
| MATTHEW L. CATE, *Respondent-Appellee*. | ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted
December 5, 2012—Pasadena, California

Filed November 1, 2013
Amended May 1, 2014

Before: Marsha S. Berzon and Sandra S. Ikuta, Circuit
Judges, and Jennifer G. Zipps, District Judge.[*]

Order;
Opinion by Judge Zipps;
Dissent by Judge Berzon

---

[*] The Honorable Jennifer G. Zipps, District Judge for the U.S. District Court for the District of Arizona, sitting by designation.

## SUMMARY**

### Habeas Corpus

The panel amended its opinion and dissent, filed on November 1, 2013; denied a petition for panel rehearing; denied a petition for rehearing en banc on behalf of the court; and ordered that no further petitions shall be entertained in a case in which the panel affirmed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition.

The panel first determined that petitioner was not entitled to statutory tolling for the 100-day gap between the denial by the California Court of Appeal of petitioner's habeas petition and the filing of his petition in the California Supreme Court because there was no "properly filed" petition pending in state court during that time, and because the delay was unreasonable.

The panel next held that petitioner failed to pass through the actual innocence gateway of *Schlup v. Delo*, 513 U.S. 298 (1995), and that the district court properly denied an evidentiary hearing.

Judge Berzon dissented. She would hold that petitioner was entitled to statutory tolling because the 100-day gap was reasonable. Alternatively, Judge Berzon would remand with instructions to hold an evidentiary hearing on petitioner's actual innocence claim because he has presented post-conviction evidence that, if credible, demonstrates this case

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to be the sort of extraordinary one that requires reaching the merits of petitioner's otherwise barred federal habeas claims.

## COUNSEL

Kurt David Hermansen (argued), Law Office of Kurt David Hermansen, San Diego, California; Jan Stiglitz, Justin Brooks, Alexander Simpson, and Alissa Bjerkhoel, California Innocence Project, San Diego, California, for Petitioner-Appellant.

Kevin Vienna (argued), Supervising Deputy Attorney General; Kamala D. Harris, Attorney General of California; Dane R. Gillette, Chief Assistant Attorney General; Gary W. Schons, Senior Assistant Attorney General; Raquel M. Gonzalez, Deputy Attorney General, San Diego, California, for Respondent-Appellee.

## ORDER

The opinion and dissent filed on November 1, 2013, and appearing at 734 F.3d 995, are amended. The superseding amended opinion and dissent will be filed concurrently with this order.

With these amendments, Judge Ikuta voted to deny the appellant's petition for panel rehearing and rehearing en banc, and Judge Zipps so recommended. Judge Berzon voted to grant both petitions. The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35(f).

Appellant's petition for panel rehearing and rehearing en banc is **DENIED**. No further petitions for rehearing or rehearing en banc will be entertained.

## OPINION

ZIPPS, District Judge:

Appellant DeArcey Jamul Stewart ("Stewart") appeals from the district court's denial of his 28 U.S.C. § 2254 habeas petition as untimely. Stewart is serving a sentence in state prison of two life terms plus seven years following convictions for attempted murder. After pursuing post-conviction relief in state court, Stewart filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of

California. After thorough review, the district court denied Stewart's federal habeas petition as untimely. On appeal, Stewart contends that the district court erred in: (1) concluding that Stewart was not entitled to statutory tolling of his federal statute of limitations under § 2244(d); (2) concluding that Stewart had not established an actual innocence claim; (3) failing to conduct an evidentiary hearing prior to dismissing Stewart's federal habeas petition; and (4) concluding that Stewart's Petition failed to adequately allege a federal claim. We affirm the district court's denial of Stewart's federal habeas petition.

## I. BACKGROUND

On September 23, 1995, brothers Mark and Michael Parish were shot by a passenger in a nearby vehicle while driving through an area of San Diego claimed by the Skyline Piru gang, of which Stewart was a member. The Parish brothers identified Stewart as the driver of the vehicle and Richard Lee as the shooter. Stewart and Lee were arrested and charged in the Superior Court of California, County of San Diego. Stewart and Lee were tried jointly and in the spring of 1996 both men were convicted on two counts of attempted murder.[1] On July 18, 1996, Stewart was sentenced to two life terms and seven years in state prison. The trial court imposed consecutive terms of life with the possibility of parole; Stewart also received a five-year sentencing enhancement based on a prior conviction.

Stewart and Lee both pursued several avenues of post-conviction relief, most of which are not relevant to this

---

[1] Lee was also convicted on one count of assault on a peace officer stemming from the circumstances of his arrest.

appeal. Stewart filed a motion for a new trial and a direct appeal. Both defendants jointly filed a petition for review in the California Supreme Court. On August 31, 2000, as a result of a state petition for writ of habeas corpus filed by Lee and not joined by Stewart, Lee's convictions for attempted murder were vacated. Lee's post-conviction relief was based on new evidence proffered by Darnell Jackson, an informant (now in witness protection) who claimed that Arnold Adkins, not Lee, was the shooter, and that Stewart was the driver of the vehicle from which the Parish brothers' shooting occurred. The state did not oppose Lee's petition, instead conceding that the newly discovered evidence was sufficiently credible to cast doubt on the integrity of Lee's convictions.

Following the vacatur of Lee's convictions, on May 14, 2002, Stewart initiated the post-conviction relief proceedings that form the basis of the pending appeal. On that date, Stewart filed a petition for writ of habeas corpus in the Superior Court of California, County of San Diego ("State Trial Court Petition"),[2] asserting that newly-discovered evidence proved that Darnell Jackson, not Stewart, was the driver of the vehicle from which the shots were fired. In support of his petition, Stewart submitted declarations from Roy Vinson, Arnold Johnson and Tatiana Daniels. On December 17, 2002, after reviewing the petition, return and

[2] California's collateral review system differs from that of other States in that it does not require, technically speaking, appellate review of a lower court determination. Instead it contemplates that a prisoner will file a new "original" habeas petition. *See Carey v. Saffold*, 536 U.S. 214, 221 (2002). Accordingly, we refer to the petitions filed by Stewart in the California trial, appellate and supreme courts as separate petitions, although they collectively represent Stewart's post-conviction litigation (and exhaustion) in the state courts of the pending federal claims.

traverse, the Superior Court denied the petition without a hearing on the ground that the declarations were not credible. On February 6, 2003, Stewart filed a petition for writ of habeas corpus in the California Court of Appeal ("State Court of Appeal Petition"), claiming: (1) the newly-discovered evidence undermined the entire case of the prosecution; (2) the trial court erred in denying Stewart's petition; (3) Stewart is actually innocent; and (4) because of the newly discovered evidence, insufficient evidence supports Stewart's conviction. On May 23, 2003, the Court of Appeal denied the petition, concluding that the declarations were not conclusive, not credible, and did not make a sufficient showing of Stewart's innocence. On August 31, 2003, Stewart filed a petition for writ of habeas corpus in the California Supreme Court ("State Supreme Court Petition"), raising the same claims presented in his State Court of Appeal Petition.[3] On August 11, 2004, the California Supreme Court summarily denied the petition.

On May 17, 2005, Stewart filed a petition for writ of habeas corpus in the United States District Court, Southern District of California, challenging the California state courts' denial of his petitions for writ of habeas corpus ("§ 2254 Petition"). Stewart's § 2254 Petition presents four claims substantially identical to those made in his state petitions: (1) newly-discovered evidence undermines the entire case of the prosecution; (2) the state court erred in denying Stewart's

---

[3] Stewart's State Supreme Court Petition was dated August 31, 2003 and received by the California Supreme Court on September 4, 2003. The district court correctly identified August 31, 2003 as the date that Stewart's State Supreme Court Petition was filed pursuant to the "mailbox rule," which calculates a pro se prisoner litigant's filing date from the date the document is delivered to a prison official for mailing. *See Houston v. Lack*, 487 U.S. 266 (1988).

petition for writ of habeas corpus; (3) Stewart is actually innocent; and (4) because of the newly-discovered evidence, insufficient evidence supports Stewart's conviction.

On February 28, 2008, a magistrate judge issued a Report and Recommendation ("R&R") recommending that Stewart's § 2254 Petition be dismissed as untimely or, alternatively, be denied because Stewart had not established actual innocence and the remaining claims did not present federal questions. Stewart objected to the R&R; he also filed a Motion for Discovery seeking to compel the State to disclose exculpatory material and an Amended Motion for Leave to Amend the Petition in order to adequately plead the federal basis of his claims.

On May 30, 2008, the district court issued an order declining to adopt the R&R, granting Stewart leave to amend and requiring the State to file a response to Stewart's Motion for Discovery. The district court concluded that the State might possess exculpatory material which could affect the court's timeliness analysis, and that therefore it was appropriate to rule on the Motion for Discovery prior to ruling on the timeliness of the § 2254 Petition. In doing so, the district court noted that Stewart's federal § 2254 Petition was untimely and not subject to statutory or equitable tolling, but that Stewart might avoid dismissal if he could pass through the "actual innocence gateway" of *Schlup v. Delo*, 513 U.S. 298 (1995). In granting Stewart's Motion for Leave to Amend, the district court accepted as filed Stewart's proposed Amended § 2254 Petition, which purported to clarify the federal basis of Stewart's claims.

During the course of briefing on Stewart's Motion for Discovery, the district court conducted an *in camera* review

of all documents upon which the State had relied in electing not to oppose Lee's state court habeas petition, as well as any other material in the State's possession that cast doubt on the Parish brothers' eye-witness identification of Stewart. The district court also expanded the record to include declarations from Stewart; Maurice League, a fellow prisoner and an associate of one of the victims; Richard Lee; and Stewart's attorney. Based on its review of the record, on April 21, 2010, the district court dismissed Stewart's Amended § 2254 Petition as untimely,[4] concluding that Stewart had not satisfied the *Schlup* gateway actual innocence standard. The district court also denied Stewart's request for an evidentiary hearing on his *Schlup* claim. This appeal followed.

## II. STANDARD OF REVIEW

We review *de novo* the district court's denial of a § 2254 petition on timeliness grounds. *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010). Findings of fact made by the district court are reviewed for clear error. *Moran v. McDaniel*, 80 F.3d 1261, 1268 (9th Cir. 1996). The Court accords a presumption of correctness to factual findings made by the state court. *Id*. The decision by the district court to decline to order an evidentiary hearing is reviewed for abuse of discretion. *Roy v. Lampert*, 465 F.3d 964, 968 (9th Cir. 2006).

---

[4] The trial court also denied Stewart's Motion for Discovery and directed the Clerk of the Court to file under seal the material submitted *in camera* by the State.

## III.    ANALYSIS

### A.  Timeliness of the Petition

28 U.S.C. § 2244(d)(1) identifies four events that potentially trigger the running of AEDPA's one-year statute of limitations.[5]  The limitations period is statutorily tolled, however, during the time that "a properly-filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2).    The district court applied 28 U.S.C. § 2244(d)(1)(A), (B) and (D) and calculated when the applicable limitations period would run under a variety of factual scenarios.  Under most of those scenarios, Stewart's § 2254 Petition was untimely and not entitled to statutory tolling.   However, with respect to its calculation under

---

[5] 28 U.S.C. § 2244(d)(1) provides:

A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action; (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(D), the district court noted conflicting evidence concerning when Stewart could have discovered the factual predicate of his federal claims and triggered the statute of limitations under that provision. The court stated that, assuming without deciding that Stewart could not have discovered the factual predicate of his claims before May 6, 2002,[6] the statute was tolled on May 14, 2002 when Stewart filed his State Trial Court Petition. The district court reasoned that if the statute of limitations was statutorily tolled from May 14, 2002 until August 11, 2004, when Stewart's State Supreme Court Petition was denied, then his § 2254 Petition was timely; the clock ran from May 6 to May 14, 2002 (7 days) and then from August 11, 2004 to May 15, 2005, when Stewart handed his § 2254 Petition to prison officials for mailing (an additional 277 days). But, the district court ultimately concluded that Stewart's § 2254 Petition was untimely because he was not entitled to statutory tolling during the entire period between May 14, 2002 and August 11, 2004. Specifically, the district court concluded that during the 100-day gap between the May 23, 2003 denial of his State Court of Appeal Petition and the August 31, 2003 filing of his State Supreme Court Petition, no "properly filed" state habeas petition was "pending" in the state court under 28 U.S.C. § 2244(d)(2).

The time between the denial of a petition in a lower California court and the filing of a subsequent petition in the next higher state court does not toll the statute of limitations pursuant to 28 U.S.C. § 2244(d)(2) if the latter petition is not

---

[6] May 6, 2002 is the date that Stewart obtained the declaration of Tatiana Daniels; the district court concluded that Ms. Daniels's declaration was the first piece of potentially admissible, exculpatory evidence Stewart obtained.

timely filed. *Carey v. Saffold*, 536 U.S. 214, 225 (2002). In the absence of a clear indication by the state supreme court that a petition is untimely, the federal court "must itself examine the delay in each case and determine what the state courts would have held in respect to timeliness." *Evans v. Chavis*, 546 U.S. 189, 198 (2006). California has a special system governing appeals when prisoners seek relief on collateral review. *Id.* at 192. Under that system, the equivalent of a notice of appeal is timely if filed within a "reasonable time." *Id*. (Stevens, J., concurring) (citing *In re Harris*, 5 Cal.4th 813, 828 n.7 (1993)). Thus, "the federal court must decide whether the filing of the request for state-court appellate review (in state collateral review proceedings) was made within what California would consider a 'reasonable time.'" *Id*. at 198. California's use of the "reasonableness" standard has prompted the United States Supreme Court to note that it is "more difficult for federal courts to determine just when a review application (*i.e.*, a filing in a higher court) comes too late." *Saffold*, 536 U.S. at 223. The Supreme Court has suggested that "the California courts themselves might alleviate the problem by clarifying the scope of the words 'reasonable time' in this context or by indicating, when denying a petition, whether the filing was timely. And the Ninth Circuit might seek guidance on the matter by certifying a question to the California Supreme Court in an appropriate case." *Chavis*, 546 U.S. at 199.[7] To date, however, "California courts have given scant guidance as to what the State considers a 'reasonable' length of time to file an application for review." *Velasquez v. Kirkland*, 639 F.3d 964, 968 (9th Cir. 2011). Until such guidance is

---

[7] The Ninth Circuit did certify this question to the California Supreme Court in 2008, but the California Supreme Court denied certification. *See Chaffer v. Prosper*, 592 F.3d 1046, 1048 n.1 (9th Cir. 2010).

provided, the Supreme Court has instructed federal courts to apply a thirty-to-sixty-day benchmark for California's "reasonable time" requirement, and courts in this circuit have developed a large body of case law which follows that instruction. *Id.* (collecting cases).**[8]**

In the present case, the district court's summation of California timeliness rules was accurate. Stewart's State Supreme Court Petition, filed 100 days after the denial of his State Court of Appeal Petition, was summarily denied by the California Supreme Court. Accordingly, the district court examined whether the 100-day delay was "reasonable" under California law. The district court, citing to *Chavis* and *Culver v. Director of Corrections*, 450 F. Supp. 2d 1135, 1140–41 (C.D. Cal. 2006), summarized California law as generally accepting a 30-to-60-day delay as reasonable, but also permitting delay beyond that length of time if the petitioner could establish good cause for the delay. The district court concluded that Stewart's 100-day delay was unreasonable and not excused by good cause. Accordingly, the district court concluded that Stewart's state court petition was not "pending" after May 23, 2003 and therefore Stewart was not entitled to statutory tolling. In so holding, the district court properly followed the United States Supreme Court's instruction to use a 30-to-60-day "benchmark" for timeliness under California law. The district court also correctly

---

**[8]** The dissent suggests that we read *Chavis* to hold that a delay in excess of 60 days is per se unreasonable under California law. Dis. Op. at 30. We have relied primarily on this Court's decision in *Velasquez* and its summary of the large body of federal case law applying a 30–60 day "benchmark" for California's reasonable time requirement. We acknowledge that this benchmark may be exceeded under appropriate circumstances.

concluded that Stewart had failed to demonstrate good cause for the 100-day delay.

Stewart argues on appeal that California law permits a 100-day gap between state court post-conviction relief petitions. In support of this claim, Stewart cites to four California state court cases which permitted the filing of a habeas petition in a higher court more than 100 days after the lower court's denial of the preceding habeas petition. In each of those cases, a gap of nine months to a year-and-a-half between state court filings was permitted due to a finding of good cause for the delay. *See In re Spears*, 204 Cal. Rptr. 333, 335–36 (Cal. Ct. App. 1984) (eighteen-month delay between direct appeal and post-conviction relief proceedings not barred by doctrine of laches because petitioner lacked capacity to represent himself, legal assistance available to indigent prisoners is scarce, and petitioner attempted to obtain legal assistance to pursue his case immediately upon affirmance of his conviction); *In re Moss*, 221 Cal. Rptr. 645, 649 (Cal. Ct. App. 1985) (nine month delay not barred by doctrine of laches where the delay was attributable to petitioner's inability to secure appellate counsel); *In re Bower*, 700 P.2d 1269, 1273 n.3 (Cal. 1985) (noting without explanation that a one-year delay is acceptable); *In re Burdan*, 86 Cal. Rptr. 549, 558 (Cal. Ct. App. 2008) (finding no substantial delay where unrepresented petitioner filed a petition for writ of habeas corpus in the Court of Appeal 10 months after denial of a similar petition in the superior court). However, these cases carry little persuasive weight. *Spears*, *Moss* and *Bower* were decided before the California Supreme Court expressly relied on *Harris*'s "reasonable time"

language in 1993.**⁹**   *Spears* and *Moss* discuss the state's "laches" argument without reference to any "reasonable time" standard.   *Bower*'s timeliness analysis is cursory and contained within a footnote.   Finally, *Burdan*'s habeas petition challenged parole proceedings and the *Burdan* court specifically explained that the timeliness rules apply with less force where the petitioner is challenging a parole board determination.   *See* 86 Cal. Rptr. at 558 (stating that a collateral attack on a conviction must be timely in order to "vindicate society's interest in the finality of its criminal judgments . . . [and] the public's interest in the orderly and reasonably prompt implementation of its laws . . . [and that] requiring a prisoner to file his or her challenge promptly helps ensure that possibly vital evidence will not be lost . . . [and protects the] psychological repose that may come for the victim [at the close of a criminal proceeding].").

Regardless, even if a 100-day delay is occasionally permitted upon a showing of good cause under California law, Stewart has failed to demonstrate good cause for the delay in this case.   Stewart attempted to explain his delay in filing his State Supreme Court Petition by alleging that "the

---

**⁹** *Harris* relied on *In re Clark*, 855 P.2d 729, 738, n.5 (Cal. 1993), which in addition to *In re Robbins*, 959 P.2d 311, 317–18 (Cal. 1998), is a case that California courts currently use to signal that a case is untimely.   *See Walker v. Martin*, 131 S. Ct. 1120, 1124 (2011).   Although Stewart contends that *Clark* and *Robbins* apply only to capital habeas petitions, no California case appears to make that distinction. To the contrary, several California Court of Appeal cases have applied *Clark* and *Robbins* to noncapital habeas petitions.   *See, e.g.*, *In re Nunez*, 93 Cal. Rptr.3d 242, 252 (Cal. Ct. App. 2009); *In re Lucero*, 132 Cal. Rptr. 3d 499, 504 (Cal. Ct. App. 2011).   In addition, the United States Supreme Court has held that the *Clark/Robbins* reasonableness standard applies to California's non-capital habeas cases as well.   *See Walker*, 131 S. Ct. at 1125.

investigation regarding newly discovered evidence was not complete until May 2002." However, the May 2002 discovery of information could not have any bearing on the 100-day gap between the May 23, 2003 denial of Stewart's State Court of Appeal Petition and the August 31, 2003 filing of his State Supreme Court Petition. Stewart argues on appeal that he made an additional showing of good cause which the district court failed to consider, namely that he was under prison emergency status and had no ability to research his petition. This argument is similarly implausible. We note that this "explanation" appeared in the "Supporting Facts" section of Ground 2 of his State Supreme Court Petition, not in the portion of the form petition which provides petitioners with the opportunity to explain a filing delay. Regardless, even if we consider Stewart's "prison emergency status" argument, it does not amount to a showing of good cause justifying Stewart's delay. As the district court pointed out, "comparison of the appellate court habeas petition and the state supreme court habeas petition reveals that [Stewart] presented the same claims in both petitions" and that Stewart did not present any new evidence to the California Supreme Court. Thus, there is no indication that research was required in the preparation of Stewart's State Supreme Court Petition. In addition, thirty days passed between the May 23, 2003 denial of Stewart's State Court of Appeal Petition and the prison emergency allegedly declared on June 23, 2003, and there is nothing in the record to suggest that Stewart was immediately transferred on that date. Even if that emergency status were considered good cause for delay, Stewart still had at least 30 days to file his State Supreme Court petition (which was identical to his State Court of Appeal petition) and he failed to do so.

Accordingly, Stewart's § 2254 Petition was not statutorily tolled during the 100-day gap between the denial of Stewart's State Court of Appeals Petition and the filing of his State Supreme Court Petition. Stewart's § 2254 Petition was not timely filed.

## B. Actual Innocence Claim.

"Actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . [or] expiration of the statute of limitations." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). When an otherwise time-barred habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error," the Court may consider the petition on the merits. *See Schlup v. Delo*, 513 U.S. 298 (1995). The Supreme Court has recently cautioned, however, that "tenable actual-innocence gateway pleas are rare." *McQuiggin*, 133 S. Ct. at 1928. "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* (citing *Schlup*, 513 U.S. at 329); *see also House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is demanding and seldom met). This exacting standard sets an extremely high hurdle for Stewart. The *Schlup* standard permits review only in the "extraordinary" case. *Schlup*, 513 U.S. at 324–27 (emphasizing that "in the vast majority of cases, claims of actual innocence are rarely successful"). Under *Schlup*, we must "assess how reasonable jurors would react to the overall, newly supplemented record," including all the evidence the petitioner now

proffers. *Lee v. Lampert*, 653 F.3d 929, 945 (9th Cir. 2011). In conducting a *Schlup* gateway review, our "function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538. Stewart contends that the district court misapplied *Schlup* because it made discrete factual findings that relied on the prior jury's determination of facts, as opposed to assessing how a reasonable juror would react to the totality of the evidence. Specifically, Stewart claims that the district court impermissibly discounted the declarations of Maurice League and Tatianna Daniels and failed to consider the cumulative effect of those declarations on the trial evidence. According to Stewart, League and Daniels's declarations undermined the testimony of both Parish brothers with respect to identification of Stewart and the vehicle used in the shooting. Stewart also contends that Daniels's declaration supported Stewart's claim that Jackson was the driver of the vehicle. These arguments are without merit.

The standard of review for a *Schlup* claim is not entirely settled in this circuit. On the one hand, Justice O'Connor, who provided the fifth vote in *Schlup*, observed that the Court had "decided that the district court committed legal error, and thus abused its discretion," and that "the Court does not disturb the traditional discretion of district courts in this area," while also acknowledging that the Court did not directly address the issue. 513 U.S. at 333–34 (O'Connor, J., concurring). Similarly, we invoked the language of abuse of discretion review in *Paradis v. Arave*, stating that "[a]s the district court applied an erroneous standard for the showing of actual innocence here, it abused its discretion." 130 F.3d 385, 396–99 (9th Cir. 1997); *see also Roe v. Anderson*, 134 F.3d 1400, 1402 n.1 (9th Cir. 1998) (abuse of discretion

review "has been subsequently adopted in numerous other contexts," citing Justice O'Connor's concurrence in *Schlup*).

On the other hand, the Supreme Court has applied a form of review in *Schlup* cases that more approximates de novo review. *See House*, 547 U.S. at 539–53 (conducting an independent application of the *Schlup* standard to the facts of the case, rejecting the state's argument that the district court's findings were conclusive, and commenting on the credibility of witnesses); *id.* at 559–62 (Roberts, C.J., dissenting) (challenging the majority's failure to give deference to the district court). We have also taken this approach. *See Larsen v. Soto*, No. 10-56118, 2013 WL 6084250 at *6 n.6 (9th Cir. Sept. 16, 2013, amended Nov. 20, 2013) (observing that "the question whether [petitioner] has satisfied the *Schlup* standard is a legal question that we review de novo"); *Lee*, 653 F.3d at 938–45; *Smith v. Baldwin*, 510 F.3d 1127 (9th Cir. 2007). Other circuits have reviewed *Schlup* claims de novo. *See Munchinski v. Wilson*, 694 F.3d 308, 335 (3d Cir. 2012); *Doe v. Menefee*, 391 F.3d 147, 163 (2d Cir. 2004) (maj. op. of Sotomayor, J.); *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 551-52 (7th Cir. 2001); *Beeman v. Iowa*, 108 F.3d 181, 184 (8th Cir. 1997); *O'Dell v. Netherland*, 95 F.3d 1214, 1250 (4th Cir. 1996) (en banc), *aff'd on other grounds*, 521 U.S. 151 (1997).

We need not determine which standard is correct in this case, however, because under either standard Stewart has failed to establish a *Schlup* claim. Our independent review and analysis of the evidence corresponds with that offered by the district court.

The record includes the following material evidence. With respect to the Parish brothers' identification of Stewart,

Mark Parish testified that Stewart was driving the vehicle; shortly after the shooting, Mark described the driver as bald but at trial clarified that the shooter had his hair in a ponytail and just appeared bald; Mark received a phone call after the shooting from a caller who identified the driver; and Mark identified Stewart in a photo lineup. Michael Parish also identified Stewart as the driver and identified Stewart in a photo lineup. With respect to the vehicle involved in the shooting, Mark Parish described a rust-colored BMW. Mark further testified that he had previously described the BMW as silver-gray because of its unusual paint job, which caused its colors to change in differing lights. In his testimony, Michael also described the vehicle as rust-colored. Both brothers selected the actual paint color of the BMW from paint samples shown to them at trial. The Parish brothers' testimony was corroborated in part by their brother-in-law, Sylvester Wade, a police detective. Shortly after the shooting, both brothers had described the vehicle to Wade as a "light silver-grayish or light-blue BMW." Wade prepared the photo lineups from which both brothers identified Stewart.

Other evidence in the record includes the testimony of other witnesses, as well as the additional evidence proffered by Stewart, such as the declarations of League and Daniels. League stated in his declaration that Mark Parish told League that he was unsure who had shot him, and that the photo identification of Lee and Stewart was the result of pressure. Daniels stated that she was Jackson's girlfriend at the time of the shooting and that Jackson confessed to her that he was the driver of a reddish-brown Honda from which another individual, Arnold Adkins (now dead) shot the Parish brothers. Some of the Parish brothers' testimony at trial and the League declaration suggest that the Parish brothers'

identification of Stewart and Lee may have been influenced by "word on the street" regarding a subsequent shooting. The record also includes Stewart's testimony regarding his alibi (that he was at home) and the possible evidentiary confusion related to another gang-related shooting that occurred hours after the Parish brothers were shot. In addition, Stewart provided a declaration from William Allen, a friend and fellow gang member, who contradicted a prosecution witness who had testified that Stewart bragged about shooting the Parish brothers at a football game. Two other declarations from family members of the actual shooter suggest that Jackson could have been the driver.

Ultimately, we conclude, as did the district court, that Stewart has failed to pass through the *Schlup* gateway for a number of related reasons. Jackson's confession, which had cast doubt on Lee's convictions, could weaken the Parish brothers' identification of Stewart only by implication; in fact, Jackson's confession implicated Stewart while exculpating Lee. In addition, Stewart had a weak alibi: several witnesses, including his mother, placed him and his BMW near the scene of the shooting, and his alibi witnesses were impeached. Moreover, the evidence suggesting possible confusion between the shooting of the Parish brothers and another gang-related shooting on the same night called only the Parish brothers' identification of Lee into question. Additional evidence related to the BMW implicated Stewart as well: the BMW that witnesses saw at the scene of the shooting was identical to the BMW that Stewart drove and possessed the same distinctive wheel rims; Stewart's BMW had gun powder residue on it, and Stewart was found cleaning the car in the middle of the night several hours after the shooting. Although the Parish brothers gave conflicting statements regarding the color of the BMW involved in the

shooting, they correctly identified the color at trial using paint swatches and even the trial judge noted that the color was difficult to describe. Stewart had ample opportunity to, and did in fact challenge or attempted to cast doubt on all of this BMW-related evidence at trial; the jury simply found his efforts unpersuasive. Finally, additional eyewitness testimony also linked Stewart's BMW to the scene. The evidence allegedly undermining Stewart's "confession" (*i.e.*, his boast to a witness about having "shot his homeboy") was of little significance given that the "confession" was only an inference by a prosecution witness.[10] Other declarations offered by Stewart were similarly equivocal, as they did not specifically exculpate Stewart.

Like the district court, we have reviewed the evidence cumulatively, assessing the trial evidence and the various deficiencies and conflicts therein. *See House*, 547 U.S. at 538; *see also Lee*, 653 F.3d at 945. We have also thoroughly considered the additional evidence proffered by Stewart and its potential exculpatory effect, including the League and Daniels declarations. League's declaration was duplicative of testimony offered at trial by Kenneth Anderson, who stated that Michael Parish told him he did not know if Stewart and Lee had shot him, and that he was getting pressure from his parents and the police. Daniels's statement that Jackson had confessed to driving a reddish-brown Honda from which

---

[10] At trial, prosecution witness Kevin Brown testified that he saw Stewart at his football practice, where Stewart told him "I shot your homeboy." Brown assumed Stewart was referring to one of the Parish brothers. In his federal post-conviction relief proceedings, Stewart offered a statement from William Allen, a friend and fellow gang member, who stated that he had never seen Stewart at Brown's football practice. The district court correctly concluded that inferential value of Brown's testimony and the impeachment value of Allen's statement were minor.

Arnold Adkins shot the Parish brothers was contradicted by the eyewitness testimony describing a light-colored BMW at the scene, as well as the testimony of the Parish brothers. As the district court explained, "considering all the evidence, which includes the evidence presented at and excluded from trial, as well as the District Attorney's investigation file and the post-conviction declarations obtained from Stewart, Stewart has failed to show that this is one of the 'extraordinary' cases where 'a court cannot have confidence in the outcome of the trial.'" We reach this conclusion in light of "how reasonable jurors would react to the overall, newly supplemented record." *House*, 513 U.S. at 538.[11]

## C. Request for Evidentiary Hearing

Stewart requested an evidentiary hearing on his Amended § 2254 Petition, contending that *Schlup* requires a hearing where credibility of witnesses is at issue. The district court declined the request. Stewart challenges that decision on

---

[11] Our conclusion is not inconsistent with *House*; in fact, a brief comparison with the facts of *House* demonstrates the thinness of Stewart's evidentiary showing in this case. In *House*, the defendant's new forensic evidence seriously undermined forensic evidence presented at trial that was crucial to the prosecution's case. Other new evidence created a strong, credible counter-narrative about whom the real perpetrator might have been. *See* 547 U.S. at 552–53. By contrast, none of the evidence Stewart offers would have had such a substantial effect in undermining the prosecution's case. Moreover, the *House* Court noted that, "considered in isolation," a reasonable jury might well disregard the [new] forensic evidence, or the evidence implicating a different suspect." *See id.* at 548, 552–53. "In combination, however, with the challenges to the [forensic] evidence, and the lack of motive with respect to [the defendant], the evidence pointing to [a different suspect] would likely reinforce other doubts as to [the defendant's] guilt." *Id.* at 552–53. Stewart's evidence, even "in combination" does not achieve this effect.

appeal, contending that the district court improperly made credibility determinations without an evidentiary hearing.

*Schlup* requires a petitioner "to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." 513 U.S. at 324. The habeas court then "consider[s] all the evidence, old and new, incriminating and exculpatory," admissible at trial or not. *Lee*, 653 F.3d at 938 (citing *House*, 547 U.S. at 538). On this complete record, the court makes a "probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* (citations omitted). Under the *Schlup* gateway standard, newly presented evidence may call into question the credibility of the witnesses presented at trial. *See Schlup*, 513 U.S. at 330. In such a case, "the habeas court may have to make some credibility assessments." *Id*. No controlling legal standard exists regarding whether the credibility assessment contemplated in *Schlup* requires an evidentiary hearing and if so, under what circumstances.[12] Generally, in

---

[12] The parties do not cite any case law articulating a legal standard regarding when an evidentiary hearing on a gateway *Schlup* claim is required. There does not appear to be any controlling law on this issue. The *Schlup* Court suggested that when considering an actual-innocence claim in the context of a request for an evidentiary hearing, the district court need not "test the new evidence by a standard appropriate for deciding a motion for summary judgment," but rather may "consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." 513 U.S. at 331–32. The Fourth Circuit has left open the possibility that a *Schlup* credibility determination could be made based on a cold record as opposed to an evidentiary hearing. *See Teleguz v. Pearson*, 689 F.3d 322, 331 (4th Cir. 2012). Stewart incorrectly cites *Johnson v. Finn*, 665 F.3d 1063 (9th Cir. 2011) in support of his claim that due process requires an evidentiary

this Circuit, "a habeas petitioner should receive an evidentiary hearing when he makes 'a good-faith allegation that would, if true, entitle him to equitable tolling.'" *Roy*, 465 F.3d at 969 (citing *Laws v. Lamarque*, 351 F.3d 919, 919 (9th Cir. 2003)).

We review the district court's decision not to conduct an evidentiary hearing for abuse of discretion. *Roy*, 465 F.3d at 968. Given the strength of the evidence before the district court and the court's method of evaluating that evidence, we conclude that the district court did not abuse its discretion in denying Stewart's request for an evidentiary hearing. The district court correctly noted that newly-presented evidence giving rise to a *Schlup* gateway innocence claim may require a credibility assessment. The district court therefore assumed that Stewart's newly-presented evidence was credible and thoroughly evaluated his actual innocence claim in light of the newly-presented evidence. The court ultimately concluded, however, that the new evidence did not adequately support Stewart's actual innocence claim. The district court noted that Stewart's newly-presented evidence could, at best, challenge the credibility of the Parish brothers' testimony, but that even if the Parish brothers' testimony were discredited, sufficient direct and circumstantial evidence independent of their testimony placed Stewart and his car at the scene of the shooting. The district court explained: "even assuming the declarations now provided by Stewart (including the Lee declaration) are credible, and assuming the Parish brothers'

---

hearing anytime credibility is at issue. *Johnson* is not on point, as it holds that a district judge may not reject the credibility finding of a magistrate judge in the context of a suppression motion or a *Batson* claim without holding a new evidentiary hearing. *Id.* at 1066. Neither of those scenarios is applicable to Stewart's case.

identification of Stewart is not credible, the evidence presented by Stewart has not caused the Court to 'lose confidence in the outcome of the trial." *Schlup*, 513 U.S. at 316. Accordingly, an evidentiary hearing is not necessary to resolve Stewart's *Schlup* claim." Thus, the district court concluded that even if it fully credited Stewart's new evidence (which would be the best result Stewart could achieve at an evidentiary hearing), Stewart would not be entitled to the relief requested. The district court was entitled to deny Stewart's request for an evidentiary hearing under these circumstances. *See Lee*, 653 F.3d at 945 ("assuming arguendo" that new evidence was reliable and rejecting *Schlup* gateway claim).

Stewart takes issue with the district court's conclusion that the newly-discovered evidence, even if fully credited, would not cause a reviewing court to lose confidence in the outcome of the trial. Specifically, Stewart claims that if deemed credible, the declarations he submitted after trial would establish that: (1) Darnell Jackson confessed to being the driver in the Parish brother shooting; (2) Jackson drove a rust-colored Honda similar to the vehicle described by the Parish brothers; and (3) Mark Parish was not sure who shot him and his identification was the result of pressure. According to Stewart, these three findings would raise reasonable doubt in the mind of a juror. This argument is without merit for the reasons stated above. The first two "new facts" listed by Stewart are supported solely by the declaration of Tatiana Daniels. Daniels states that Jackson admitted that he was driving a reddish-brown Honda from

which Adkins shot the Parish brothers.[13]   This alleged statement by Jackson is at odds with Jackson's earlier statement - which prompted Lee's conviction to be vacated - that Stewart drove the vehicle from which Adkins shot the Parish brothers.   It is also contradicted by eye-witness testimony describing a light-colored BMW drive away from the scene as well as subsequent in-court identification by the Parish brothers of the BMW paint color they described alternately as "rust" and "light grey."   Maurice League's declaration that Mark Parish told him he was not sure who shot him and that the identification was the result of pressure was duplicative of evidence presented at trial through the testimony of Kenneth Anderson.   The district court had ample support for its conclusion that Stewart's newly-discovered evidence did not tip the *Schlup* determination in his favor.

## IV.    CONCLUSION

Based on the foregoing, we conclude that Stewart is not entitled to statutory tolling and that he did not make a showing of actual innocence sufficient to pass through the *Schlup* gateway.   The district court properly reached its decision without an evidentiary hearing.   Because the Amended § 2254 Petition is time-barred, we need not consider the district court's conclusion that the Petition failed

---

[13] In his declaration, Roy Vinson stated that Jackson possessed a .357 caliber revolver which Jackson said had been used in "a shooting."  This declaration does not directly link Jackson to the shooting of the Parish brothers.

to state a federal claim.  The judgment of the district court is therefore **AFFIRMED.**[14]

---

BERZON, Circuit Judge, dissenting:

I respectfully dissent.  I would reverse the district court's dismissal of Stewart's habeas petition.

In my view, Stewart was entitled to statutory tolling of the Antiterrorism and Effective Death Penalty Act's ("AEDPA") one-year limitations period during the 100-day interval between his successive state habeas petitions.  Alternatively, I would remand with instructions to hold an evidentiary hearing on Stewart's claim for an equitable exception to AEDPA's filing deadline under *Schlup v. Delo*, 513 U.S. 298 (1995), as applied in *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013), to timeliness issues.[1]  Stewart has presented post-conviction evidence that, if credible, demonstrates this case to be the sort of extraordinary one that, under *Schlup*, requires reaching the merits of his otherwise barred federal habeas claims.

In holding otherwise, the majority treats the applicable standard of review as unsettled, when that is not so—there is no doubt a *de novo* standard is applicable.  Additionally, the

---

[14] **IT IS FURTHER ORDERED THAT** Stewart's Motion to Supplement and request for judicial notice filed on December 23, 2010 (Dkt. No. 13) is **DENIED AS MOOT.**

[1] For convenience, I refer in this dissent to both the *Schlup* and *McQuiggin* exceptions as *Schlup* claims.

majority seriously misapprehends the record it reviews; on the current record, considered properly, Stewart should be accorded an evidentiary hearing as to his *Schlup* claim.

I.

A.

AEDPA's one-year limitations period is tolled for "[t]he time during which a properly filed application for State post-conviction or other collateral review . . . is pending." 28 U.S.C. § 2244(d)(2). A petition is "pending" during the interval between a lower state court's adverse decision and the filing of an appeal only when the appeal is timely. *Evans v. Chavis*, 546 U.S. 189, 191 (2006). Under California's unusual collateral review system, petitioners are required to file successive petitions for habeas corpus to each higher court in turn, each successive petition serving as the equivalent to a notice of appeal. *See Walker v. Martin*, 131 S. Ct. 1120, 1125–26 (2011) (describing California's system of post-conviction review). This "equivalent of a notice of appeal is timely if filed within a 'reasonable time.'" *Chavis*, 546 U.S. at 192 (quoting *In re Harris*, 5 Cal. 4th 813, 828 n.7 (1993)). Under this indeterminate system, there is no firm upper limit on the length of time that California courts consider reasonable for interval tolling between successive habeas petitions. *See, e.g.*, *In re Reno*, 283 P.3d 1181, 1208 (Cal. 2012). By retaining discretion, California courts may "home in on case-specific consideration and . . . avoid the harsh results that sometimes attend consistent application of an unyielding rule." *Martin*, 131 S. Ct. at 1130.

*Chavis* permitted interval tolling under California's system of collateral review on the assumption "that

California's 'reasonable time' standard would not lead to filing delays *substantially longer* than those in States with determinate timeliness rules." *Id.* at 199–200 (emphasis added) (citing *Carey v. Saffold*, 536 U.S. 214, 222–23 (2002)); *accord Velasquez v. Kirkland*, 639 F.3d 964, 967 (9th Cir. 2011). The Court looked to the "30 to 60 days[] that most States provide for filing an appeal to the state supreme court" as a point of comparison for assessing whether the interval between the filing of successive state habeas petitions conforms to California's "reasonable time" requirement. *Chavis*, 546 U.S. at 201.

But *Chavis* did not hold that a delay longer than 60 days could never be reasonable. It held unreasonable only the unexplained six-month delay before the Court. Absent justification, that six-month interval was "far longer than the 'short period[s] of time' that most States provide for filing an appeal to the state supreme court." *Id.* (alteration in original).[2]

---

[2] Since *Chavis*, "California law has not clarified whether a filing delay greater than 60 days *necessarily* qualifies as 'substantial.'" *Chaffer v. Prosper*, 542 F.3d 662, 666 (9th Cir. 2008) ("*Chaffer I*") (emphasis added). The Supreme Court of California denied our request for certification of that question in *Chaffer I*, and has not answered it since. *See Chaffer v. Prosper*, 592 F.3d 1046, 1048 n.1 (9th Cir. 2010) (per curiam) ("*Chaffer II*") ("California has not provided any guidance as to what constitutes a timely non-capital habeas petition."); *accord Velasquez*, 639 F.3d at 967. We have characterized "California's reasonableness standard [as] *commensurate with* the limitations of other states, which are 30 or 45 days." *Cross v. Sisto*, 676 F.3d 1172, 1176, 1179 (9th Cir. 2012) (emphasis added) (citing *Carey*, 536 U.S. at 222). But neither the Supreme Court of the United States nor California's high court has held that California's indeterminate "reasonable time" period is uniformly *coextensive* with other states' limitations.

Whether California courts would consider a given filing delay reasonable is inherently a fact- and circumstance-specific question, *Martin*, 131 S. Ct. at 1130; the shortest period deemed "unreasonable" under California law in one case does not necessarily mark the longest delay permissible in another. Accordingly, while we have held that *multiple* unexplained delays of 80 to 115 days between successive petitions are "unreasonable" under California law, *see Velasquez*, 639 F.3d at 968; *Chaffer II*, 592 F.3d at 1048, that does not mean that the *single* period of 100 days at issue in Stewart's case could not be reasonable, in light of his circumstances. In particular, the petitioner in *Velasquez* was "represented by counsel at all stages." 639 F.3d at 968. Stewart, in contrast, filed his petition to the California Supreme Court *pro se*, a difference California courts often emphasize in holding delayed filings reasonable. *See, e.g.*, *In re Saunders*, 472 P.2d 921, 925–26 (Cal. 1970); *In re Lucero*, 132 Cal. App. 4th 38, 44–45 (Ct. App. 2011); *In re Burdan*, 169 Cal. App. 4th 18, 31 (2008).

In a recent case, we left open the possibility that a four-and-a-half-month delay may be reasonable under California law. We remanded to the district court to determine in the first instance whether the prisoner's petition was timely, noting that the interval "may be within the range of reasonableness if [the petitioner's] explanation for the delay is adequate under California law." *Noble v. Adams*, 676 F.3d 1180, 1184 (9th Cir. 2012). *Noble* emphasized that "the California Court of Appeal has excused delays of several months where the petitioner offered an adequate explanation for the delay," particularly in *pro se* cases. *Id.* (citing *In re Burdan*, 169 Cal. App. at 30–31 (excusing a delay of ten months for a *pro se* petitioner whose attorney said he would handle the appeal but did not do so); *In re Crockett*, 159 Cal.

App. 4th 751, 757–58 (2008) (excusing a delay of approximately five months where the attorney "had no prior experience with appellate writs and could not obtain the assistance of experienced appellate counsel")).

The majority's attempt to cabin the holding of *In re Burdan*, one of the cases cited in *Noble*, to the context of petitions challenging parole decisions is unconvincing. To be sure, *In re Burdan* explained that the rationale for requiring prompt filing of habeas petitions challenging convictions in the capital context does not apply "where a life prisoner challenges a parole decision." 169 Cal. App. 4th at 31. But the court went on to state in a separate paragraph, "[a]t any rate"—in others words, the policy considerations underlying the timeliness rules aside—"[w]e do not find a delay of 10 months for an unrepresented prison inmate to file a petition for writ of habeas corpus in the Court of Appeal, after denial of a similar petition in the superior court, to be unreasonable." *Id.*

In addition to the cases cited in *Noble*, several other California cases have permitted the filing of a habeas petition more than 100 days after a lower court's denial of the preceding petition. *See In re Bower*, 38 Cal. 3d 865, 873 n.3 (1985); *In re Moss*, 175 Cal. App. 3d 913, 921–22 (1985); *In re Spears*, 157 Cal. App. 3d 1203, 1208 (1984). The majority finds none of these cases persuasive, but only because it reads them selectively.

For example, the majority dismisses the relevance of *In re Spears* and *In re Moss* on the ground that they predate the California Supreme Court's express use of the "reasonable time" language from *In re Harris*, 5 Cal. 4th at 828 n.7 (citing *In re Clark*, 855 P.2d 729, 751–52 (Cal. 1993)), and therefore

contain no discussion of the operative timeliness standard. *See* Maj. Op. at 14–15 & n.9. But *Harris* relied on *In re Clark*, which, by its own terms, did not "modify the timeliness requirements applicable to all habeas corpus petitions," except for certain exceptions not pertinent here. *In re Clark*, 855 P.2d at 751; *accord In re Sanders*, 981 P.2d 1038, 1047 (Cal. 1999). In any case, the majority overlooks the content of the *Spears* and *Moss*: *Spears* unequivocally states that "18 months is not a significant delay." 157 Cal. App. 3d at 1208 (citing *In re Hancock*, 67 Cal. App. 3d 943, 945 n.1 (1972)). And *Moss* held that, given the petitioner's inability to secure appellate counsel, "a delay of nine months . . . is not a significant delay." 175 Cal. App. 3d at 922.

The majority's dismissal of *In re Bower* as insufficiently reasoned is equally unconvincing. *See* Maj. Op. at 15. Rather, the cursory character of *Bower*'s analysis indicates that the Supreme Court of California considered it unnecessary to expound on why a delay of less than one year is not "undue." *See* 38 Cal. 3d at 873 n.3. Presumably, a considerably shorter delay, 100 days, would require even less explanation.

In short, the single 100-day delay between the California Court of Appeal's denial of Stewart's petition on May 23, 2003 and the filing of his subsequent *pro se* petition in the California Supreme Court on August 31, 2013 was not necessarily unreasonable under California law.

## B.

Moreover, unlike the petitioner in *Velasquez*, 639 F.3d at 968, and like the petitioners in *Spears*, *Moss*, *Bower*, and *Burdan*, Stewart offered an explanation for the delay, one that

California courts would likely find adequate.  In his petition
to the Supreme Court of California, Stewart wrote: "Due to
[sic] state of emergency status declared June 23, 2003 at
Salinas Valley State Prison, and the transferring of petitioner
out of Salinas Valley State Prison to Calipatria State Prison,
the writ is brought in a timely period."  The district court did
not acknowledge this explanation, let alone assess its
adequacy under California law.   The majority, in turn,
dismisses the state of emergency and prison transfer as an
"implausible" excuse for the filing delay, on the ground that
no research was required in the preparation of the petition to
the California Supreme Court because it presented no new
evidence or claims.  *See* Maj. Op. at 16.

In sharp contrast to the majority's dismissive approach to
Stewart's explanation, the Supreme Court in *Chavis* evaluated
a California habeas petitioner's explanation for his delay by
"viewing every disputed issue most favorably to [him]."
546 U.S. at 201.  Viewed through the *Chavis* prism, rather
than that of the majority, Stewart's explanation for the delay
in filing his California Supreme Court petition passes muster.

The need for ongoing investigation or research is but "one
example of good cause," not the only potential justification
for delay during prison lockdowns and transfers.  *In re
Robbins*, 18 Cal. 4th 770, 805 (1998).   There are other
impediments that a prison's emergency status may pose to the
timely filing of a prisoner's *pro se* petition.  While Stewart's
opening brief on appeal mentioned his inability to "research
his petition" due to "a lock-down" and "subsequent transfer,"
it also cited, more generally, "limited access to resources due
to the prison emergency and subsequent transfer."

The mechanics of re-drafting and filing a petition, including obtaining the papers previously filed, copying them by accessing means of duplication, procuring suitable packaging material for the documents, and determining the location of the appropriate court, can all be onerous for a *pro se* prisoner, lacking both legal training and resources. Stewart's assertions permit an inference that the restrictions on his movements imposed during the state of emergency and changes in his custodial conditions made it difficult for him to accomplish such tasks. Thus, while the fact that the claims and supporting evidence presented in successive habeas petitions are nearly identical undercuts excusing a lawyer's delay in filing a petition, *see Velasquez*, 639 F.3d at 968, the multiple difficulties prisoners proceeding *pro se* encounter while in lockdown and during transfers are indeed pertinent to excusing delay, even where the successive petitions are similar or identical.

Finally, that Stewart's "explanation" appeared in the "Supporting Facts" section of his *pro se* petition to the California Supreme Court rather than the designated portion of the form, *see* Maj. Op. at 16, has no bearing on whether it may adequately justify the delay. I have found no indication—and the majority cites none—that California courts would consider such a technical factor dispositive and so refuse to consider an explanation that does provide good cause for delay.

I conclude that, in light of the explanation Stewart offered, California courts would not consider the 100-day period between the state Court of Appeal disposition and the filing of Stewart's habeas petition in the California Supreme Court unreasonable. The majority's contrary conclusion generates precisely the sort of "harsh results" California has

sought to avoid, by adopting a discretionary system. *Martin*, 131 S. Ct. at 1130. I would therefore reverse the district court's dismissal of Stewart's petition as untimely.

## II.

Even if Stewart is not entitled to statutory tolling and his federal petition would therefore be time-barred under AEDPA, he may be entitled to an equitable exception to § 2244(d)(1). In my view, he has presented evidence of actual innocence that, if credible, is sufficient to pass through the *Schlup* gateway. *See Perkins*, 133 S. Ct. at 1931; *Larsen v. Soto*, — F.3d —, No. 10-56118, 2013 WL 6084250, at *10 (9th Cir. Sept. 16, 2013); *Lee v. Lampert*, 653 F.3d 929, 934 (9th Cir. 2011) (en banc). Reviewing Stewart's *Schlup* showing *de novo*, and in light of all available evidence, I would hold that an evidentiary hearing is necessary to determine whether he has shown that it is more likely than not that no reasonable juror would have convicted him on the supplemented record, and thus that he is entitled to have his "otherwise time-barred claims heard on the merits." *Lee*, 653 F.3d at 932, 937. I would therefore reverse and remand for the district court to hold a *Schlup* hearing.

## A.

The majority suggests that the case law is ambiguous concerning the correct standard of review—*de novo* or abuse of discretion—for *Schlup* actual innocence claims. That characterization is plain wrong. By reopening a settled issue, the majority has, with no justification, muddied our jurisprudence. Moreover, *Schlup* claims arise with some frequency, and, as I believe may be true here, the correct, *de novo* standard of review can often make a difference.

As the majority acknowledges, *see* Maj. Op. at 9, we generally review the denial of a § 2254 petition *de novo*, whether that denial turns on procedural grounds or on the merits of the petition. *See Stancle v. Clay*, 692 F.3d 948, 952–53 (9th Cir. 2012) (reviewing *de novo* the denial of a petition on timeliness grounds); *Waldron-Ramsey v. Pacholke*, 556 F.3d 1008, 1011 (9th Cir. 2009) (reviewing *de novo* whether the statute of limitations should be equitably tolled). The same standard applies to the district court's determination that a petitioner has failed to meet *Schlup*'s actual innocence standard. Neither precedent nor policy supports any contrary conclusion.

i.

Precedent makes clear beyond dispute that *de novo* review is proper. Most notably, recent en banc decisions have evaluated *Schlup* claims by independently and exhaustively reviewing the supplemented records that such cases present. In *Lee v. Lampert*, for example, an en banc panel of this Court intensively canvassed the supplemented record to make its *own* "probabilistic determination about what reasonable, properly instructed jurors would do" if faced with the new evidence, as the *Schlup* standard demands. 653 F.3d at 938 (internal quotation marks omitted); *see also Smith v. Baldwin*, 510 F.3d 1127, 1139–46 (9th Cir. 2007) (en banc) (canvassing the supplemented record exhaustively to assess a *Schlup* claim). In *Sistrunk v. Armenakis*, to name another example, "[t]he sole issue on appeal" was a *Schlup* claim, yet the en banc court still observed that the denial of a habeas petition was properly reviewed *de novo*. 292 F.3d 669, 672–77 (9th Cir. 2002) (en banc). Three-judge panels of this Court have conducted similarly comprehensive and independent reviews of the supplemented records petitioners

have presented to them. *See, e.g.*, *Gandarela v. Johnson*, 286 F.3d 1080, 1085–87 (9th Cir. 2001); *Wood v. Hall*, 130 F.3d 373, 379 (9th Cir. 1997). Most recently, a three-judge panel of this Court observed that satisfaction of "the *Schlup* standard is a legal question that we review de novo." *Larsen*, 2013 WL 6084250, at *6 n.6. Although none of these cases explained *why* they conducted *de novo* review of *Schlup* claims, that is exactly what they did. And the circuits that have confronted the issue expressly have *all* concluded that *de novo* review of *Schlup* claims is appropriate. *See Munchinski v. Wilson*, 694 F.3d 308, 337 (3d Cir. 2012); *Doe v. Menefee*, 391 F.3d 147, 163 (2d Cir. 2004); *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 552 (7th Cir. 2001); *Beeman v. Iowa*, 108 F.3d 181, 184 (8th Cir. 1997); *O'Dell v. Netherland*, 95 F.3d 1214, 1250 (4th Cir. 1996) (en banc), *aff'd*, 521 U.S. 151 (1997).

True, as the majority points out, *Paradis v. Arave* reversed the denial of a habeas petition alleging actual innocence under *Schlup* on the ground that, because "the district court applied an erroneous [legal] standard for the showing of actual innocence here, it abused its discretion." 130 F.3d 385, 396 (9th Cir. 1997). But that decision preceded the en banc cases I have cited. *See Ortega-Mendez v. Gonzales*, 450 F.3d 1010, 1019 (9th Cir. 2006) (explaining that three-judge panels are not bound by the decision of a prior three-judge panel when it is irreconcilable with a subsequent en banc decision). Further, *Paradis* mentioned the standard of review in passing; it had no occasion to consider, and did not, whether a more stringent standard was appropriate, as the district court's decision flunked even the most deferential review. Further, where the challenge is to the legal standard applied, abuse of discretion and *de novo* review reach the same result; it is with respect to mixed

questions of fact and law that the difference between the two standards matters most, *cf. United States v. Hinkson*, 585 F.3d 1247, 1259–60 (9th Cir. 2009) (en banc), and such a question was not at issue in *Paradis*.

The majority's invocation of Justice O'Connor's concurrence in *Schlup*—which supposedly supports abuse-of-discretion review—fares no better. As Justice O'Connor recognized in her *Schlup* concurrence, the majority opinion in that case did not "speak to the standard of appellate review." 513 U.S. at 334. It did not need to do so, because the underlying decision in that case was—just as in *Paradis*—based "on an erroneous view of the law," and thus failed even under deferential review. *Id.* at 333. A concurrence of one justice as to an issue concededly *not* decided by the majority is not precedent.

Moreover, a Supreme Court case subsequent to *Schlup*, *House v. Bell*, 547 U.S. 518 (2006), essentially applied *de novo* review to a *Schlup* claim. That case observed that "[d]eference is given to a trial court's assessment of evidence presented to it in the first instance." *Id.* at 539. But *House* then explained that "the *Schlup* inquiry . . . requires a holistic judgment about *'all* the evidence,'" an inquiry which "does *not* turn on discrete findings regarding disputed points of fact, and '[i]t is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses.'" *Id.* at 539–40 (quoting *Schlup*, 513 U.S. at 328, 329) (emphases added). The majority recognizes, correctly, that the standard in *House* "approximates de novo review." Maj. Op. at 19.

Here—unlike in *House*—there has been no evidentiary hearing, and the trial court purported to accept all the

evidence "presented to it in the first instance" as credible. There was therefore no occasion to make factual findings as to that evidence in isolation. *House* thus confirms that the application of the *Schlup* standard on the entire record is one as to which the district court neither finds facts nor exercises discretion. *De novo* review is therefore appropriate.[3]

In short, my colleagues read the relevant precedents incorrectly. The applicable case law is in no way indeterminate as to the applicable standard of review for *Schlup* issues. *De novo* consideration is the proper standard. The majority's equivocation upends settled law, sowing doubt where there should be none. "Our task to clarify the law—not to muddy the waters." *United States v. Virginia*, 518 U.S. 515, 574 (1996) (Scalia, J., dissenting). The majority inverts that commonsense maxim.

ii.

If the proper standard of review *were* an open question—which it is not—we should be answering that question, not leaving it open to perplex future litigants and panels. And were we to approach the issue afresh, we could only conclude that *de novo* review is proper for *Schlup* claims.

---

[3] *McQuiggin* noted, in passing, that on remand "the District Court's appraisal of Perkins' petition as insufficient to meet *Schlup*'s actual-innocence standard should be dispositive, *absent cause . . . .*" 133 S. Ct. at 1936 (emphasis added). This language does not describe any of the usual standards of review—e.g., *de novo*, clear error, abuse of discretion. "Absent cause" could mean "unless incorrect"; it certainly does not mean "abuse of discretion."

Selecting an appropriate standard of review often requires assessing whether "one judicial actor . . . [is] better positioned than another to decide the issue in question." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 403 (1990) (internal quotation marks omitted). *De novo* review is especially appropriate where, as here, relief turns on application of "'fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed.'" *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436 (2001) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)); *accord Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989). Allocating authority over such concepts to appellate courts with supervisory power facilitates the uniform development of the law and enhances predictability. *Cooper Indus.*, 532 U.S. at 436; *Ornelas*, 517 U.S. at 697; *Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991). Such coherence and uniformity are especially necessary where "the stakes—in terms of impact on future cases and future conduct—are too great to entrust them finally to the judgment of the trier of fact." *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 501 n.17 (1984).

All these concerns apply here. The *Schlup* standard is, in its very nature, "fluid." Much like probable cause or reasonable suspicion, which the Court has characterized as "fluid concepts" subject to *de novo* review, *Ornelas*, 517 U.S. at 696, the *Schlup* standard describes a probabilistic inquiry that emphasizes differences of degree rather than kind. Retaining appellate control over that standard is essential for two, interrelated reasons. First, the interest *Schlup* protects—avoiding conviction of an actually innocent person—reflects a concern that "has long been at the core of our criminal justice system." 513 U.S. at 325. Second, and

conversely, appellate courts must guard against excessive application of the *Schlup* standard, "[t]o ensure that the fundamental miscarriage of justice exception . . . remain[s] 'rare' and [is] only applied in the 'extraordinary case.'" *Id.*at 321, 324. Preserving the narrow scope of such a vague but important standard thus requires substantial appellate oversight.

By contrast, none of the usual justifications for deference apply here. "When, for example, the issue involves the credibility of witnesses and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court and according its determinations presumptive weight." *Miller*, 474 U.S. at 114. At the pre-evidentiary hearing stage, this consideration has no application whatever (and only a limited application after an evidentiary hearing, as *House* explains, 597 U.S. at 539–40).

Similarly, "it is 'especially common' for issues involving supervision of litigation to be reviewed for abuse of discretion." *Salve Regina*, 499 U.S. at 233 (quoting *Pierce v. Underwood*, 487 U.S. 552, 558 n.1 (1988)). This deference recognizes the trial judge's traditional control over the conduct of a trial, and his need for "broad power to cope with the complexities and contingencies inherent in the adversary process." *Geders v. United States*, 425 U.S. 80, 86 (1976). The *Schlup* standard, however, concerns matters never presented at trial, and thus does not trespass on the trial judge's traditional bailiwick. Indeed, a court evaluating a *Schlup* claim is not "bound by the rules of admissibility that would govern at trial" and may include in its assessment evidence that "was either excluded or unavailable at trial."

*Schlup*, 513 U.S. at 327–28; *accord Lee*, 653 F.3d at 938 (quoting *House*, 547 U.S. at 538)).

Ultimately, then, pertinent policy considerations compel the conclusion that precedent supports: This Court must review *Schlup* claims *de novo*, not for abuse of discretion.

iii.

Analogy to parallel bodies of law further confirms this conclusion. Consider, for example, review of claims of insufficient evidence under *Jackson v. Virginia*, 443 U.S. 307 (1979). The *Schlup* standard is structurally similar to—although it is substantively distinct from—the *Jackson* standard. Whereas *Jackson* asks whether a rational trier of fact *could* convict on the record evidence, *Schlup* asks whether a reasonable trier of fact *would* more likely than not convict on a supplemented record. *See Schlup*, 513 U.S. at 330; *Lee*, 653 F.3d at 938 n.13.

If anything, *Schlup* claims are more amenable to *de novo* review than *Jackson* claims: *Jackson* entails assessment of the trier of fact's *actual* findings, usually after the presentation of live testimony, and thus treads more heavily on the factfinder's traditional prerogatives. *See Schlup*, 513 U.S. at 330. By contrast, the *Schlup* standard "focuses the inquiry on the likely behavior of the trier of fact," before the trier of fact has had any opportunity to consider evidence contained in the supplemented record. *Id.* Nevertheless, this Court reviews *de novo* a district court's assessment of the evidence under *Jackson*. *See, e.g.*, *United States v. Garrido*, 713 F.3d 985, 999 (9th Cir. 2013). *A fortiori*, it ought to review *Schlup* claims under the same standard.

Harmless error determinations offer a second useful analogy. Harmless error standards vary widely by doctrinal context. *See, e.g.*, *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Chapman v. California*, 386 U.S. 18, 24 (1967). Despite this variety, harmless error analysis, much like the *Schlup* standard, *always* concerns a hypothetical question—whether the trier of fact would have arrived at a different conclusion but for the error. By no means does such counterfactual analysis require appellate courts to act as "a second jury to determine whether the defendant is guilty." *Neder v. United States*, 527 U.S. 1, 19 (1999) (internal quotation marks omitted). Instead, the court reviews the entirety of the record "'*in typical appellate-court fashion*'" to predict the outcome absent the error. *United States v. Rodrigues*, 678 F.3d 693, 696 (9th Cir. 2012) (emphasis added) (quoting *Neder*, 527 U.S. at 19). Such review is *de novo. Id.* So, too, here: *Schlup* poses a hypothetical question answered by surveying the record, and we appropriately review the district court's counterfactual conclusion *de novo*.

iv.

Finally, neither the lengthiness nor the commendable exhaustiveness of the district court's discussion of the evidence can alter the *de novo* nature of our review. To be sure, the district court's thorough analysis of the record greatly eases our work, by blazing a trail through the evidence and pointing to the factual intersections most important to our ultimate inquiry. It remains our task, however, to predict from the supplemented record in its entirety, not what actually happened, but what a reasonable and properly instructed jury would have concluded, had it

been faced with the new evidence as well as that presented at trial.[4]

As to the district court's decision not to hold an evidentiary hearing before ruling on Stewart's *Schlup* claim, that ruling, as the majority correctly notes, *is* reviewed for abuse of discretion. *See Smith*, 510 F.3d at 1137. But if we are unable, without an evidentiary hearing, to determine the "likely impact" of the petitioner's new evidence of innocence "on reasonable jurors," *Lee*, 653 F.3d at 945, as *Schlup* requires, then the district court's denial of Stewart's request for such a hearing constitutes an abuse of discretion. In other words, if our probabilistic determination as to whether jurors would convict Stewart necessarily depends upon the relative credibility and accuracy of the new witnesses as compared to those who gave contrary testimony at trial, then the refusal to hold an evidentiary hearing is an abuse of discretion.

### B.

Applying the proper standard of review to Stewart's claim, I conclude that he has met the *Schlup* standard sufficiently to require an evidentiary hearing.

---

[4] We are to consider a petitioner's diligence in pursuing his petition as a factor in our assessment of whether actual innocence has been convincingly shown. *See Perkins*, 133 S. Ct. at 1935–36. That consideration, however, weighs very little here, because: (1) the exoneration of Richard Lee, Stewart's co-defendant, through information provided by Jackson, itself occurred years post-trial, yet that information, also of importance to Stewart's *Schlup* claim, was considered reliable enough to overturn Lee's conviction; and (2) Stewart missed the AEDPA filing deadline by very little, as I explained in Part I.

The *Schlup* standard is "exacting"; it "'permits review only in the "extraordinary" case.'" *Lee*, 653 F.3d at 938 (quoting *House*, 547 U.S. at 538). "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *Perkins*, 133 S. Ct. at 1928 (alteration in original) (quoting *Schlup*, 513 U.S. at 329). This "demanding" standard is "seldom met." *Id.*

Still, *Schlup* "does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538. "[W]here post-conviction evidence casts doubt on the conviction by undercutting the reliability of the proof of guilt, but not by affirmatively proving innocence, that can be enough to pass through the *Schlup* gateway to allow consideration of otherwise barred claims." *Lee*, 653 F.3d at 938, 943 (quoting *Sistrunk*, 292 F.3d at 673).

In my view, the record reveals this case may well be an "extraordinary" one of the type contemplated by *Schlup* and *Perkins*, *see Perkins*, 133 S. Ct. at 193—that is, one "fall[ing] within the narrow class of cases implicating a fundamental miscarriage of justice." *Majoy v. Roe*, 296 F.3d 770, 776 (9th Cir. 2002). "This is not a case of conclusive exoneration. Some aspects of the State's evidence . . . still support an inference of guilt. Yet the central . . . proof connecting [Stewart] to the crime"—here the victims' eyewitness identification of their assailants—"has been called into question, and [Stewart] has put forward substantial evidence pointing to a different suspect"—namely, Darnell Jackson. *House*, 547 U.S. at 553–54. Absent an evidentiary hearing at which both the credibility of the post-trial witnesses and the

accuracy of their statements are probed, the district court could not properly determine, and we cannot properly review, whether, after considering all of the conflicting testimony, it is "more likely than not [that], in light of the new evidence, . . . any reasonable juror *would have* reasonable doubt" as to Stewart's guilt. *Id.* at 538 (emphasis added).

I would remand for the district court to determine, after a *Schlup* hearing, whether this is such a "rare case." *Id.* at 554. To explain why requires examining the facts of this case in some detail.

i.

Stewart was convicted, after a joint trial, of two counts of attempted murder. He was identified at trial as the driver of a car from which a passenger, Stewart's co-defendant, Richard Lee, shot Mark and Michael Parish ("the Parish brothers") in a nearby vehicle, injuring both non-fatally. The prosecution's case against both defendants rested chiefly on the eyewitness testimony of the victims, who insisted that they had seen clearly the faces of their assailants—both the shooter, who was physically closer to them (according to Mark Parish's trial testimony, approximately eight feet away), and the driver—and could also identify the car involved. In closing arguments, the prosecution underscored the Parish brothers' certainty of their identification, repeating the Parish's words: "I'll never forget the people who shot me. I'm not mistaken." And, to further emphasize the victims' reliability, the government explained the risks the Parish brothers faced in testifying, because they would be branded as "snitches" in their gang milieu.

The prosecution's case against Stewart also relied heavily on descriptions of the car from which the victims were shot. As I detail in Part II.B.ii those descriptions, unlike the identification of the assailants, were wildly contradictory, both for each individual witness and among witnesses, and so worth little as evidence against Stewart.

The prosecution's additional evidence against Stewart included: Stewart's affiliation with the Skyline Pirus, which was hostile to the Parish brothers' gang; police testimony that Stewart was found, hours after the shooting, cleaning his mother's BMW; evidence of gun-shot residue detected on Stewart's vehicle the night of the shooting; contradictory accounts, including from Stewart and his mother, regarding Stewart's whereabouts on the evening of the shooting; and testimony of an acquaintance of the Parish brothers, Kevin Brown, that Stewart had gloated sometime after the shooting, "I killed your homeboy," which Brown assumed was a reference to the shooting of the Parish brothers (even though there were two of them and they were not killed).

In 2000, four years after the trial, Lee's conviction was overturned based on a statement from a third party informant and friend of Lee's, Darnell Jackson, that directly contradicted the victims' testimony as to the identity of the shooter. Jackson named Arnold Adkins, recently deceased, as the shooter of the Parish brothers, while asserting that Stewart was the driver of the car from which they were shot. It does not appear from the record that Jackson's statement was made under oath. Nonetheless, the government did not oppose Lee's habeas petition, conceding that "there appears to be newly discovered evidence which is sufficiently credible to cast doubt on the integrity of [Lee's] convictions."

Because his conviction was based largely on the very same victim accounts called into question by the post-trial evidence exculpating Lee, Stewart filed his own state habeas petition, asserting his innocence. *See In re Weber*, 11 Cal. 3d 703, 724 (1974). The basis for his petition was evidence acquired through his attorney's investigation of the information provided in Lee's habeas case—namely, a letter sent by the District Attorney to Lee's counsel describing Jackson's statement.[5] Stewart contended that Jackson's statement gravely impeached the Parish brothers' account of the crime, and that other evidence indicated Jackson, not Stewart, had been the driver. In support of his petition, Stewart submitted declarations from three acquaintances of Jackson's—Roy Vinson, Arnold Johnson, and Tatianna Daniels—all of whom implicated Jackson in the Parish brothers' shooting; a statement from Maurice League, a friend of both Mark Parish and Stewart; a statement from Stewart's co-defendant, Lee; and a statement from Stewart's attorney.

The California Superior Court denied post-conviction relief, holding that "the evidence is not credible because of inherent inaccuracies and witness bias" and fails to "completely undermine the prosecution's case." In the last reasoned state court decision on Stewart's case, the California Court of Appeal agreed, concluding that "[t]he declarations at best raise an issue of credibility without providing a

---

[5] Stewart sought access to both Jackson's statement itself and to the files related to the state's investigation of Lee's habeas petition, but was provided with neither. Those files were later submitted to the district court for in camera review, and were subsequently filed under seal, after the district court determined that they did not "exonerate" Stewart, and thus were not subject to discovery. I discuss the impact of those files later.

complete defense." Because the new evidence does not "point unerringly to innocence," the Court of Appeal held, it does not justify acquittal on the basis of a substantive claim of actual innocence. Neither state court held an evidentiary hearing.

The burdens of proof and standards applicable to a substantive actual innocence claim under California law and a *Schlup* claim of procedural actual innocence for federal habeas purposes are different. *See Schlup*, 513 U.S. at 313–16; *In re Clark*, 5 Cal. 4th 750, 766 (1993); *In re Weber*, 11 Cal. 3d at 724. To demonstrate actual innocence, California courts require a "complete defense" and evidence pointing "unerringly to innocence." *In re Weber*, 11 Cal. 3d at 724, 725. In contrast, new evidence undermining the credibility of trial witnesses carries weight under *Schlup*, as credibility assessments are within the scope of the habeas court's review, and affirmative proof of innocence is not necessary. *See Schlup*, 513 U.S. at 330. Thus, Stewart does not need to clear the same hurdles to pass through the *Schlup* gateway as he did to establish substantive actual innocence under California law.

ii.

Here is a summary of the new evidence presented on habeas:

First, Jackson's ex-girlfriend, Tatianna Daniels, attested that Jackson confessed to her that he was the driver of the vehicle from which Arnold Adkins shot the Parish brothers. Her declaration states that Jackson drove "a red or reddish-brown 4-door Honda," which he indicated was the car used in the shooting.

Second, Vinson's declaration provides circumstantial evidence of Jackson's involvement, although it does not directly name Jackson as the driver of the car from which the Parish brothers were shot. Vinson stated that around the time of the shooting (September 23, 1995), Adkins and Jackson came to Vinson's house in a rust-colored Honda, seeking to rid themselves of a "hot" .357 revolver, the type of weapon used in the Parish brothers shooting. Around that same time, Vinson continued, Adkins confessed to shooting two men and said that the person with him at the time of the shooting was a "close friend." Vinson knew that Adkins and Jackson were close friends and spent a lot of time together.

The circumstantial evidence in Vinson's declaration implicating Jackson is corroborated by Haughen, Stewart's attorney. Haughen's declaration states that Vinson informed him by letter that Jackson was the driver of the vehicle from which Adkins shot the Parish brothers.

Third, Johnson's declaration states that Adkins told him in 1996 that he (Adkins) and Jackson had been fired on while at a night club sometime in early 1995, and had subsequently "taken care of" the people responsible. When he asked Adkins what he meant by "taken care" of them, Johnson attested, Adkins said "he and Darnell Jackson had shot and killed them." Adkins was killed not long after this exchange with Johnson. Johnson declared that he spoke with Jackson at Adkins' funeral, where Jackson told him he did not think that Adkins' death had anything to do with the shootings in which he (Jackson) and Adkins had been involved, because "everyone believed that two other guys named PeeDu

[Stewart's street moniker] and Puff [Lee's street moniker] had done the shooting and had been locked up for it."[6]

Fourth, Maurice League stated that Mark Parish told him he was unsure who shot him. At trial, a defense witness, Kenneth Anderson, testified that Mark's brother, Michael, did not know if Stewart and his co-defendant Lee were involved, but was pressured to identify them.

Far from being "duplicative" of Anderson's testimony, as the majority asserts, Maj. Op. at 22, League's declaration is entirely distinct from—though broadly consistent with— evidence presented at trial, if for no other reason than that it pertains to the *other* brother, Mark. The testimony of two different individuals to similar but distinct facts is corroborative, not cumulative, and thus bears on the perceived credibility of the Parish brothers. Moreover, even cumulative evidence can "tip the scales" for or against a defendant. *See Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (alterations omitted) (quoting *Krulewitch v. United States*, 336 U.S. 440, 444–45 (1949); *Hawkins v. United States*, 358 U.S. 74, 80 (1958)) (holding prejudicial erroneously admitted evidence, even if cumulative).

Fifth, Lee, Stewart's former co-defendant, stated that the District Attorney contacted Lee with an offer to provide Lee with information, furnished by Jackson, that would exonerate Lee of the Parish brothers' shooting, if Lee promised not to testify in an upcoming trial at which Jackson was a key

---

[6] According to testimony at trial, police gang files list Stewart's street name as "Pee-Du," "P-Du" or "P-Dew" and Lee's as "Pufferoo" or "Puff." References to "P-Du" and "Pufferoo" appear in the trial transcript as well as the post-trial record and the parties' briefs.

witness. Lee's testimony in that trial would have impeached Jackson. Lee agreed to this quid pro quo. His attorney filed a habeas petition on his behalf, using the information provided by the District Attorney.

Lee's declaration also states that, in the course of the District Attorney's investigation of his habeas petition, he was interviewed while housed at Salinas Valley State Prison about the Parish brothers' incident. Lee attested that he told the investigator that neither he (Lee) nor Stewart was involved in the shooting, but that two other individuals were responsible. Lee's declaration does not, however, name those individuals.

The district court gave little weight to Lee's statement because he did not disclose the identity of the driver of the vehicle. But if the driver was Jackson, as Stewart's post-trial evidence indicates, Lee's refusal to name him could be explained by his desire not to impugn the credibility of the very individual whose statement secured his own release.

Finally, in support of his *Schlup* claim, Stewart requested discovery of all documents on which the District Attorney's office based the decision not to oppose Lee's habeas petition. After reviewing those materials in camera, the district court denied the discovery request, concluding that the evidence would not "exonerate" Stewart, and thus did not advance his *Schlup* claim. My own inspection of those materials, however, leads me to conclude that they would help to meet the *Schlup* standard—which is not exoneration—and that discovery under seal therefore should have been allowed. The sealed documents are relevant not only to the reliability of evidence presented at trial but also to the reliability of the post-trial declarations Stewart presented on habeas. They

further undermine the reliability of the Parish brothers' testimony about the identity of their assailants and provide some circumstantial evidence that Jackson, not Stewart, may have been involved in the crime. The district court's denial of Stewart's discovery motion was therefore an abuse of discretion. *See Cooper v. Brown*, 510 F.3d 870, 877 (9th Cir. 2007) (identifying the applicable standard of review).

If credible, the new evidence would thus make it more likely than not that no reasonable juror would convict Stewart based on the supplemented record.

The majority's contrary conclusion rests on two assumptions. First, the majority assumes that the evidence exonerating Lee only undermines the Parish brothers' identification of Stewart "by implication," if at all, because "in fact, Jackson's confession implicated Stewart while exculpating Lee." Maj. Op. at 21. But Jackson's statement impeaching the Parish brothers' identification of Lee as the shooter *significantly* damages the credibility of the Parish brothers' testimony, given that: (1) the shooter was closer to the brothers than the driver; and (2) the brothers repeatedly avowed their *certainty* regarding the shooter's identity, yet were disproved as to that identity by Jackson.

This impeachment amplifies the problems that already marred the brothers' testimony at trial. That testimony was riddled with inconsistencies, including contradictory statements regarding the color and make of the car, the driver's hair style, and whether they had ever seen the shooter or driver before the incident. Given those flaws in their trial testimony, a demonstration that the brothers' identification of one of the assailants—the easier one to identify, given their location—was decidedly wrong would likely tarnish the

credibility of their identifications of the other assailant so severely that a reasonable juror would essentially discount them.

Furthermore, if Jackson were actually the driver, as Stewart's post-trial witnesses indicate, then he would have a clear motive to implicate Stewart in his statements exonerating his friend, Lee. The majority reaches a contrary conclusion, presuming that reasonable jurors would believe Jackson's statements rather than the contradictory testimony by Daniels, Vinson, or Johnson, whose declarations all implicate Jackson to one degree or another in the Parish brothers' shooting. But that assumption lacks foundation, particularly given that Stewart's post-trial witnesses signed sworn statements, while the record contains no declaration from Jackson under oath. Even were it otherwise, we cannot gauge the *relative* credibility of post-trial witnesses—i.e., compare Jackson's credibility to Daniels'—when none have testified.

The majority's second assumption is that, even if the Parish brothers' identification of Stewart were discredited, "sufficient direct and circumstantial evidence independent of their testimony placed Stewart and his car at the scene of the shooting." Maj. Op. at 25. Under the majority's view, reasonable jurors would still find Stewart guilty beyond a reasonable doubt, based principally on testimony indicating that his car was involved in the crime. But the testimony about the car was wildly inconsistent. No reasonable juror would have convicted Stewart based primarily on the evidence concerning the car from which the shots were fired.

First, we cannot, as the majority would have it, presume that the jury concluded "[t]he BMW involved in the shooting

was identical to the BMW that Stewart drove," or, as the district court did, that "the jury rejected the argument that a brown or rust-colored Honda was involved." It is entirely possible that the jury convicted Stewart *in spite of* its uncertainty regarding the car, based on the victims' eyewitness identification. Thus, we must evaluate the car evidence directly, rather than relying on the jury's assumed findings regarding the vehicle.

Second, even if the car evidence were much stronger than it is, a reasonable juror would likely not convict based primarily on such evidence. People lend cars to one another. That a particular car was used in a shooting is not proof beyond a reasonable doubt—without reliable identification of the driver—of who was driving the vehicle.

Third, and critically, the Parish brothers' descriptions of the car involved in the shooting were rife with inconsistencies. In their pretrial interviews, both brothers described the car as "rust-colored" or a "brownish-rust color," but also—inconsistently—as a light silver-grayish, light blue, or bluish-gray color.

At trial, Mark Parish testified that the car from which he and his brother were shot was a "brownish-rust color," and admitted that he had also described the car as "rust-colored" during the preliminary hearing. When Mark was shown two paint samples from a BMW dealer, he selected the sample that correctly depicted the color of Stewart's mother's car, which the district court described as "light bronze." But when asked what "rust-colored" means to him, Mark said, "like a copper," and agreed that the water jug in the courtroom, which the judge described as "brown or copper color," was "rust." When further pressed on his

understanding of the color "rust," Mark asked to speak to "counsel." One police officer testified at trial that Mark had said the vehicle was "a dark-colored BMW-type vehicle," "possibly maroon." Another officer testified that Mark had described the car as "light bluish or grayish."

His brother, Michael, similarly testified that the car from which he was shot was "a light brown, tan, rust color," and defined rust as "a light brown, a brownish color, like a tannish." Then, when shown two paint samples from a BMW dealer, Michael, like his brother, selected the sample that correctly depicted the color of Stewart's mother's car. He also admitted, however, that he had described the car to a police officer as "rust color" immediately after the shooting and later in the hospital, and acknowledged that he repeated that same account of the car's color at the preliminary hearing. When asked whether he subsequently changed the description to "bluish-gray" or "silver," Michael stated that he did not recall. On cross-examination, Michael answered affirmatively when asked whether the assailants' car was "a rust-colored BMW."

The brothers' accounts also varied with regard to whether the car from which they were shot had two or four doors, and whether its tires had three-star or five-star rims. The other eyewitnesses called by the prosecution, Michael Sturdivant and Michael Cole, described the car still differently. Sturdivant testified that he saw a gray or white car, which could have been a BMW *or* a Nissan Sentra, swerving in and out of traffic near where the shooting occurred. Cole testified that after hearing shots from his home, he stepped outside to glimpse a "shiny, light-colored, possibly gray roof [of a car] as it disappeared" out of sight.

The evidence Stewart presented on habeas adds to the uncertainty regarding the car involved in the shooting. One eyewitness, whose statement was taken several months after the shooting, described seeing "a beige, dark colored car like a 79 Honda Accord or Civic driving slow" at the scene of the Parish brothers' shooting. Other post-trial declarations implicating Jackson, rather than Stewart, as the driver and Arnold Adkins as the shooter describe Jackson's car as a reddish-brown four-door Honda and attest to seeing Adkins and Jackson together in a rust-colored Honda with tinted windows on the days before the shooting. This evidence suggests, at the very least, that other gang members may have had vehicles matching one or another of the descriptions of the car involved in the Parish brothers' shooting. Yet, a police officer involved in investigating the Parish brothers' shooting testified at trial that no one looked through any gang files to determine whether anyone other than Stewart was known to drive a "rust-colored" BMW or similar model car.

The upshot is that no reasonable juror would find the car evidence alone a sufficient basis to convict Stewart. Aside from the inherent uncertainty as to who was driving, both the color and the make of the car used in the shooting are far from clear when the evidence is considered in its entirety.

### iii.

Given the weakness of the car evidence, the other circumstantial evidence presented at trial does not add enough support to the verdict to eliminate reasonable doubt as to guilt. First, there is evidence concerning Stewart's whereabouts at the time of the shooting. The majority points to Stewart's mother's testimony placing Stewart and the BMW he drove in the area of the shooting around the time of

the crime. *See* Maj. Op. at 21. But her testimony on this point is, at most, indeterminate. She testified that she thought she saw the tail end of her own BMW but later determined it was not hers. A police detective testified that Stewart's mother had stated to police that she saw her son in the BMW while she was picking up her daughter at her mother's house on the evening of the shooting, in the vicinity of the crime. At trial, however, Stewart's mother denied making such a statement.

As to the gunshot residue found on Stewart's mother's BMW, the prosecution's expert witnesses testified that such residue is easily transferred from one surface to another, can be deposited by sources other than guns, and would not likely remain adhered to the surface of a moving vehicle.

The evidence that Stewart was "cleaning" his car when the police located him on the night of the shooting is also thin. There was no testimony that Stewart was seen washing the vehicle or removing anything that could have been incriminating. Nor is there any suggestion of evidence connected to the crime that could have been "cleaned" away, such as blood. The officer who encountered Stewart testified that he did not remember what Stewart was doing that gave him the impression he was cleaning the vehicle when the officer approached him in the parking lot of Stewart's apartment complex. According to the officer's testimony, Stewart appeared to have been picking up papers or bottles from underneath the seat of the car, but Stewart ceased doing so at the officer's request, and no attempt was made to seize any of the items he may have discarded. Thus, the conclusion that Stewart was cleaning the car was not only speculative but did not involve cleaning up anything that was even arguably evidence of the crime. A reasonable juror would be unlikely

to give weight to the officer's vague observations as proof of Stewart's guilt.

Brown's testimony at trial that Stewart bragged about his involvement in the Parish brothers' shooting provides little additional support for Stewart's conviction. A post-trial witness attested that Stewart never came to the school where he allegedly spoke with Brown about the shooting. More importantly, the reported statement was about a killing, not a non-fatal shooting; it referred to one person, rather than two; and it did not mention the Parish brothers by name. Neither of the Parish brothers died. Another member of the Parish brothers' gang was murdered on the same night the brothers were shot. Stewart has not been charged with that murder, so any evidence concerning it is irrelevant.

### III.

Under the *Schlup* gateway standard, when "the newly presented evidence . . . call[s] into question the credibility of the witnesses presented at trial[,] . . . the habeas court may have to make some credibility assessments." *Schlup*, 513 U.S. at 330. As the majority notes, *Schlup* did not identify whether and when that assessment requires an evidentiary hearing. *See* Maj. Op. at 24 n.12. Further, although the district court here accepted all the post-trial evidence as credible—in the sense that the witnesses were telling the truth as they perceived or remembered it—it went on to decide on a cold record the accuracy of that testimony, as compared to the accuracy of the inculpatory testimony at trial.

In my view, Stewart's new evidence, if credible, combined with the exoneration of his co-defendant and the

weakness of the trial evidence, sufficiently indicate that Jackson was the driver of the vehicle from which the Parish brothers were shot, so as to entitle Stewart to override the AEDPA time limit for filing a habeas claim. *See Perkins*, 133 S. Ct. at 1932. That a declarant's testimony might be impeachable because of inconsistencies with other evidence is reason to hold an evidentiary hearing, not to refrain from holding one. Unless proffered testimony is far-fetched or disproven by physical or documentary evidence, a court cannot reasonably determine the credibility and reliability of witnesses other than through an in-person hearing, with cross-examination. In particular, there is no sensible way to resolve the *Schlup* issue here without a chance to cross-examine Jackson on his assertion that Stewart was the driver, in light of substantial post-trial evidence that Jackson was the driver. Because we cannot evaluate Stewart's *Schlup* claim without an evidentiary hearing, the district court's failure to conduct such a hearing is an abuse of discretion. *See supra* Part II.A.iv.

The key question in assessing whether the district court abused its discretion concerning holding an evidentiary hearing is whether such a hearing "would produce evidence more reliable or more probative" with regard to Stewart's assertion of actual innocence than the declarations before the district court district. *Griffin v. Johnson*, 350 F.3d 956, 966 (9th Cir. 2003). Here, there is no doubt that it would, by enabling the court to assess the basis of the affiants' statements; probe the reasons for their delay in coming forward; and explore other factors bearing on how reasonable jurors are likely to perceive the overall reliability of various witnesses' testimony. The district court's dismissal of Stewart's *Schlup* claim in absence of such a hearing was an abuse of discretion.

## Conclusion

For the foregoing reasons, I would reverse the district court's dismissal on timeliness grounds, or, in the alternative, remand for an evidentiary hearing on Stewart's *Schlup* claim. Neither of those dispositions would resolve whether Stewart's petition presents federal claims cognizable under § 2254, and I express no opinion as to the merits of his petition.